DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Deborah Mitchell, individually, as administrator of the estate of Leonard Dale Mitchell, and as the next friend of Mr. and Mrs. Mitchell's son Thomas (jointly "appellants"), appeals from the Huron County Court of Common Pleas' grant of summary judgment to Norwalk Area Health Services, which does business under the name North Central EMS ("NCEMS"), and the other appellees. Appellants filed a complaint against NCEMS and John and Jane Does one through ten, for wrongful death, willful and wanton conduct in causing the decedent's death, infliction of serious emotional distress, loss of consortium, and spoliation of evidence. Appellants have also appealed the trial court's denial of their motion to strike an affidavit alleged to conflict with deposition testimony.
 {¶ 2} Appellants assign the following errors:
 {¶ 3} "1. The trial court erred in granting the motion for summary judgment because the record contains evidence upon which a jury could conclude that the defendants acted in a willful or wanton fashion in failing to provide Appellants' decedent with necessary emergency medical treatment.
 {¶ 4} "2. The trial court was incorrect when it denied Appellants' motion to strike the inconsistent portions of Shannon Belcher's Affidavit, and, at the very least, the trial court again erred in granting NCEMS' motion for summary judgment because a genuine issue of material fact exists, for purposes of summary judgment, when the relevant factual allegations in the pleadings, affidavits, depositions, or interrogatories are in conflict.
 {¶ 5} "3. The trial court erred in granting NCEMS' Motion for Summary Judgment on Appellants' Spoliation Claim as there exists [sic] genuine issues of material fact.
 {¶ 6} "4. The trial court erred in granting NCEMS' Motion for Summary Judgment on Appellants' claims of negligence with respect to NCEMS' policies, practices and procedures."
I.
 {¶ 7} Appellants' first assignment of error focuses upon the standard applied by the trial court in determining that appellees retained their immunity from liability. Appellants' fourth assignment of error focuses upon the significance of the role played by NCEMS' own policies, practices and procedures in granting summary judgment. Specifically, appellants contend that when NCEMS violated their own policies and applicable protocols for cardiac arrest care, a genuine issue of fact arises as to whether the failure to observe such policies and protocols constitutes willful or wanton misconduct. Additionally, appellants' second assignment of error, in part, proffers alleged inconsistencies between appellees' paramedics' deposition and her affidavit as indicative of a material issue of fact. Because the first, second, and fourth assignments of error focus on the propriety of granting summary judgment to appellees, we address them jointly.
Summary Judgment
 {¶ 8} An appellate court reviews a grant of summary judgment de novo, the same standard as the trial court. Smiddy v. The Wedding Party, Inc.
(1987), 30 Ohio St.3d 35, 36. Pursuant to Civ. R. 56, a trial court is required to construe the evidence in a light most favorable to the non-moving party, determine whether any genuine issues of material fact exist, and determine whether reasonable minds could differ as to whether judgment should be entered against the non-moving party. Civ. R. 56(C). An appellate court, reviewing a grant of summary judgment, also examines the record in the light most favorable to the party opposing the motion.Engel v. Corrigan (1983), 12 Ohio App.3d 34, paragraph one of the syllabus.
 {¶ 9} In order to overcome summary judgment, a non-moving party must advance "specific, provable facts and not mere allegations; evidence of a possible inference is not sufficient." Jackson v. Alert Fire SafetyEquip., Inc. (1991), 58 Ohio St.3d 48, 52. "[T]he strength of inferences from the evidence are tested to determine whether they are sufficient to justify but one conclusion, which conclusion is adverse to the moving party." Durham v. Major Magic's All Star Pizza Revue, Inc., 6th Dist. No. L0-4-1192, 2005-Ohio-1029, ¶ 13.
 {¶ 10} A court determines that but one conclusion is justifiable by examining the record for an absence of a genuine issue of material fact. A two-step process is therefore implicated. "Determination of the materiality of facts is discussed in Anderson v. Liberty Lobby, Inc.
(1986), 477 U.S. 242. `As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' Id. at 248." Turner v. Turner
(1993), 67 Ohio St.3d 337, 340. If a material fact exists, then a court must determine whether a genuine issue must be presented to a jury. In this second analysis, a court is guided by the following inquiry: Does the evidence present "a sufficient disagreement to require submission to a jury" or is it "so one-sided that one party must prevail as a matter of law[?]" Id., citing Anderson v. Liberty Lobby, Inc. supra, at 251-252.
Facts
 {¶ 11} According to Mrs. Mitchell and Thomas Mitchell's testimony, on August 5, 2001, Mrs. Mitchell was woken from sleep by a noise in the living room where Mr. Mitchell, the decedent, was watching television. She went to investigate and found Mr. Mitchell sitting in a chair, gasping, and unable to breathe. After a "few moments," she called 9-1-1 and told them that her husband was "having trouble breathing."
 {¶ 12} Mrs. Mitchell woke Thomas Mitchell. Thomas, who was 15 years old at the time, woke neighbors in the building and asked if they knew CPR; no one did. While Thomas was thus engaged, Mrs. Mitchell called 9-1-1 a second time because she thought Mr. Mitchell had stopped breathing altogether; she did not remember what she said to 9-1-1. She and Thomas got Mr. Mitchell onto the floor, and she began chest compressions. She could not find her husband's pulse, and described him as "stiff" and "foaming at the mouth."
 {¶ 13} Police officers arrived, and shortly after, the NCEMS squad arrived. Mrs. Mitchell stated that the EMS personnel immediately put a bag over Mr. Mitchell's mouth; she also stated she saw a defibrillator sitting there right away. She did not know whether the squad brought the defibrillator in immediately. She saw the EMS personnel doing chest compressions and placing defibrillator pads on Mr. Mitchell's chest. After the defibrillator was in place, she saw the EMS personnel "try" to defibrillate, but she saw nothing happen. She remembered hearing one say "that they couldn't get a connection or something."
 {¶ 14} Mrs. Mitchell then saw them try to deliver another shock with the defibrillator. Shortly after this second shock, a police officer offered to take her and Thomas to the hospital to wait for the ambulance, and she and Thomas left.
 {¶ 15} Mrs. Mitchell described her husband's health as "very good," and stated that he had no chronic health conditions and took no medications.
 {¶ 16} Appellants submitted a chronology of events occurring from the time Mrs. Mitchell first called 9-1-1, compiled from evidentiary materials including the NCEMS squad "run report" which the two squad members, paramedic Shannon Belcher and EMT Billie Jo Morrow, hand-wrote after delivering Mr. Mitchell to Bellvue Hospital; appellants' chronology and the supporting materials were submitted to the trial court for its consideration on the motions for summary judgment. The portions of that chronology which list the times that the squad attempted to defibrillate Mr. Mitchell are as follows:[1]
 {¶ 17} "00:36[2] — call received for difficulty breathing
 {¶ 18} "00:42:53 — Arrival of S. Belcher and B.J. Morrow
 {¶ 19} "00:43:52 — Second call comes in — patient stopped breathing
 {¶ 20} "00:44 — CPR started
 {¶ 21} "00:45:41 — M. Adamcio and D. Short dispatched
 {¶ 22} "00:47 — Shock attempt [with] 200 [joules] with Zoll
 {¶ 23} "00:49:40 — M. Adamcio and D. Short arrive
 {¶ 24} "00:49:45 — Retrieved the mobile life Physio/Lifepak
 {¶ 25} "00:50 — Shock attempt [with] 200 [joules] with Zoll
 {¶ 26} "00:53 — Shock attempt [with] 200 [joules] with Zoll — indicated and crossed out [on Belcher's run report].
 {¶ 27} "* * *
 {¶ 28} "00:56 — 1 mg Epinephrine/PEA indicated
 {¶ 29} "00:57 — 1 mg Atropine/v-fib[3] indicated
 {¶ 30} "00:57 — Attempted to shock with Zoll; patient in v-fib.
 {¶ 31} "00:59 — Shocked @ 200 with Zoll, arc noted — fine v-fib.
 {¶ 32} "1:00 — Attempted to shock 300 with Zoll monitor — unsuccessful
 {¶ 33} "* * *
 {¶ 34} "1:08 — Physio Lifepak applied and turned on per Code Summary Sheet
 {¶ 35} "1:11 — Defib @ 360 with Lifepack [sic]
 {¶ 36} "1:13 — Defib at 360 with Lifepack
 {¶ 37} "* * *
 {¶ 38} "1:14 — Defib at 360 with Lifepack
 {¶ 39} "1:16 — Defib 360 with Lifepack
 {¶ 40} "* * *
 {¶ 41} "1:20 — Defib 360 with Lifepack
 {¶ 42} "* * *
 {¶ 43} "1:21 — [Emergency room] arrival
 {¶ 44} "1:22 — Defib at 360 with Lifepack"
 {¶ 45} The chronology of events occurring after the NCEMS squads arrived on the scene is crucial to appellants' arguments. Appellants essentially argue that the NCEMS squad members' failure to immediately
use the Lifepack defibrillator that the second squad brought with them, and their continuing defibrillator attempts with the non-functioning Zoll unit, constituted willful and wanton misconduct. To determine whether the grant of appellees' summary judgment motion was proper, we will construe these facts and inferences therefrom in appellants' favor.
 {¶ 46} Shannon Belcher was the lead paramedic on the first squad to arrive at the Mitchell's residence; Billie Jo Morrow was an EMT basic in Belcher's squad and under Belcher's supervision that night. Belcher testified that, upon their arrival at the Mitchells', they found Mrs. Mitchell performing CPR. Neither Belcher nor Morrow heard the second dispatcher call informing them that Mr. Mitchell had stopped breathing. Belcher and Morrow did not carry the Zoll unit into the Mitchell residence; the protocols and training Belcher had received did not mandate bringing a monitor into a scene when the dispatch was for "difficulty breathing."
 {¶ 47} When Belcher saw Mr. Mitchell, he was "unresponsive": no pulse, no respirations, no blood pressure, no capillary refill, and fully dilated pupils. She told Morrow that they had a "full arrest" and told her to get the defibrillator monitor. Morrow called the dispatcher for another squad to give backup assistance. Belcher testified that while Morrow was retrieving the defibrillator, she performed CPR on Mr. Mitchell.
 {¶ 48} Belcher testified that Mr. Mitchell was on the Zoll defibrillator-monitor at approximately 00:47.
 {¶ 49} The Zoll unit was a combination heart monitor and defibrillation unit. The defibrillator delivers energy through the same adhesive patches which take heart rhythm readings from the patient and display them on the unit's monitor. On the first shock attempt, the Zoll unit failed to deliver any energy. In deposition, Belcher did not remember if it displayed an error message. In the three minutes between the first shock attempt and the second shock attempt, Belcher and Morrow checked the monitor leads, cables, and defibrillator pad placement. During these three minutes, Belcher stated that the police officer was performing CPR on Mr. Mitchell.
 {¶ 50} The second shock attempt also failed to deliver a shock, or any discernable energy. Belcher stated that they did not re-check the leads and cables again. She did not remember why she wrote, or why she crossed out, the third shock attempt on the run sheet she completed, and she could not remember whether a third shock with the Zoll unit was attempted. In a document titled "North Central EMS Patient Run Report," completed by Belcher after Mr. Mitchell was delivered to the Bellvue emergency room, she wrote regarding the second shock: "Attempted against @ 200 joules after pads and leads were double checked again monitor failed [sic]. Showing `poor pad contact' on monitor." During her deposition, she acknowledged that NCEMS protocol required all squads to maintain two sets of defibrillator pads in the squad truck; during Mr. Mitchell's run, only one set of pads was in the truck.
 {¶ 51} When asked what happened in the minutes after the second shock attempt, Belcher stated that Mr. Mitchell was not in ventricular fibrillation the whole time, and since ventricular fibrillation is the only rhythm in which a patient can be shocked, that must be the explanation for a subsequent failure to shock. She could not be sure, however, since no heart rhythm monitoring strips were printed from the Zoll unit. She had noted on the run report that at least at 00:56, Mr. Mitchell was in "PEA" — pulseless electrical activity — which is not a "shockable" heart rhythm.
 {¶ 52} Belcher testified that she had never before had to administer a shock using the Zoll unit, had not been trained to troubleshoot the Zoll unit, and that she was unfamiliar with the error messages that it displayed. She stated she knows the importance of arriving at a scene with a defibrillator in hand for a cardiac arrest. She explained that ventricular fibrillation ("v-fib") is a term for when "there's no electrical activity. It's [the heart] just quivering." The "definitive way to stop v-fib" according to Belcher, is a shock with a defibrillator and that the only heart rhythm in which a patient can be defibrillated is ventricular defibrillation. Belcher further testified that her training taught her that a patient should be defibrillated within the first four to six minutes of a cardiac arrest.
 {¶ 53} M. Adamcio and D. Short constituted the second squad to arrive on the scene. They were dispatched to the Mitchell residence in response to Mrs. Mitchell's second call that Mr. Mitchell had stopped breathing. Neither party disputes that the second squad did not arrive in the Mitchell residence with their defibrillator (the "Lifepack" unit) in hand — although they do dispute how and why that was the case. Regardless, the Lifepack defibrillator-monitor unit was inside the Mitchell residence shortly after the second squad's arrival.
 {¶ 54} The bulk of appellants' arguments focus on the choice that the NCEMS personnel had once the Lifepack was on the scene: to either continue to attempt defibrillations with the Zoll, or to switch defibrillators and use the Lifepack. Appellants point to Belcher's and Morrow's deposition testimony where they state that they do not know or cannot remember why they continued to attempt to shock Mr. Mitchell with the Zoll monitor, and their acknowledgements that they knew it was not functioning properly. Monitoring strips indicate that the Lifepack was not powered on until 1:08, and was not used to deliver a defibrillating shock until 1:11 — approximately 21 minutes after the Lifepack arrived. Likewise, appellants point to appellees' experts' testimony, which states that the standard of care for paramedics and EMTs is to deliver three defibrillator shocks in quick succession when a monitor shows a patient in ventricular fibrillation. Appellants' brief also points to issues of fact regarding the methods and rate at which the squad intubated Mr. Mitchell and inserted an intravenous line to administer drugs; however, the bulk of their argument concentrates on characterizing the failure to use the Lifepack immediately upon its availability at the scene, combined with a continued use of what the squad members knew to be a non-functioning defibrillator, as willful or wanton conduct.
Legal Standard
 {¶ 55} R.C. 4765.49(B)[4] provides immunity to political subdivisions performing emergency medical services. The statute also blankets corporations and other business entities under contract with a political subdivision to provide such services. A plaintiff may overcome the statutory grant of immunity in cases where "the services are provided in a manner that constitutes willful or wanton misconduct." Id.
 {¶ 56} The parties do not contend that different legal standards apply. Both parties cite essentially the same case law, with similar facts, as examples of willful or wanton misconduct on the part of paramedics and providers of emergency services. The trial court found, and we agree, that the standard articulated in Wright v. City of Hamilton
(2001), 141 Ohio App.3d 296, is succinctly and clearly articulated:
 {¶ 57} "`Willful and wanton misconduct' constitutes more than mere negligence. Brockman v. Bell (1992), 78 Ohio App.3d 508. It is behavior which demonstrates `a deliberate or reckless disregard for the safety of others.' Reynolds v. City of Oakwood (1987), 38 Ohio App.3d 125, 127.
 {¶ 58} "`Wanton' misconduct implies the failure to exercise any care toward those to whom a duty of care is owed, when the probability that harm will result is known to the actor. Wieber v. Rollins (1988),55 Ohio App.3d 106, 109. `Willful' misconduct involves the intent, purpose, or design to injure another. Easterling v. Am. Olean Tile Co.
(1991), 75 Ohio App.3d 846, 853. Willful misconduct implies an intentional disregard of a clear duty or of a definite rule of conduct, a purpose not to discharge such duty, or the performance of wrongful acts with knowledge of the likelihood of resulting injury. See Denham v. Cityof New Carlisle (2000), 138 Ohio App. 3d 439 * * *." Wright v. City ofHamilton (2001), 141 Ohio App. 3d 296, 301-302, discretionary appeal denied (2001), 92 Ohio St.3d 1418.
 {¶ 59} Wright also represents the rule that a plaintiff must establish the relevant standard of care for paramedics through expert testimony. "As the standard of care of [sic] expected of a paramedic * * * is not sufficiently obvious that nonprofessionals could reasonably evaluate the defendants' conduct, expert testimony is necessary to establish the appropriate standard of care." Wright v. City of Hamilton (2001),141 Ohio App. 3d 296, 302, citing Bruni v. Tatsumi (1976),46 Ohio St.2d 127, 130.
 {¶ 60} Appellants are correct when, in their brief, they note that the proper standard pursuant to R.C. 4765.49 is whether the conduct at issue was either willful or wanton, and that in order to overcome appellees' statutory immunity one need not prove facts supporting both the willfuland wanton standards. Wright, as quoted supra, does misstate the statutory standard.
Expert Testimony
 {¶ 61} Appellants argue that the trial court failed to examine appellees' own experts' testimony when it granted summary judgment, and instead only considered the affidavits of appellants' experts. The trial court correctly noted that most of appellants' experts' affidavits contain legal conclusions; to the extent that they do so, the trial court correctly disregarded them. However, the same affidavits are relevant in determining the applicable standard of care for paramedics when delivering emergency care to patients in cardiac arrest.
 {¶ 62} Guy Haskell, appellants' expert witness regarding the standard of care and the allegedly willful and wanton misconduct of appellees, has extensive experience, training, and national certifications in paramedic care. Haskell stated in his affidavit that the current national standard of care for EMS personnel is the American Heart Association ("AHA") Advanced Cardiac Life Support ("ACLS") textbook. Referencing the deposition testimony of Belcher and the NCEMS supervisor and director, he agreed with them insofar as the definitive treatment for ventricular defibrillation is a defibrillating shock. He stated the standard of care for delivering emergency defibrillating shocks by quoting the AHA Guidelines:
 {¶ 63} "[Basic Life Support] is often successful if defibrillation (and other modes of definitive case) occurs sooner than 8 to 10 minutes after collapse. If restoration of spontaneous circulation occurs after the 8 to 10 minute limit, the frequency of significant permanent neurological damage becomes unacceptably high. Responding and shocking as fast as possible, seldom exceeding 8 to 10 minutes, is a central objective of all EMS systems."
 {¶ 64} Haskell also averred that this standard was included in the NCEMS protocols. In his opinion, the delay in delivering the Lifepack shocks to Mr. Mitchell was "avoidable" because (1) Belcher's patient report notes show that she was aware that the Zoll defibrillator pads had "poor pad contact"; (2) no attempt was made to change the pads because a second set of pads was unavailable, contrary to NCEMS' protocols, AHA protocols, and the Zoll manufacturer recommendations; (3) Belcher and Morrow offered no justification for the delay in switching to the Lifepack defibrillator and using it as soon as it was available.
 {¶ 65} Appellants also submitted the affidavit of Dr. Charles Love, M.D., a practicing cardiologist at the Ohio State University Medical Center. Aside from his legal conclusions, he also averred that the standard of care for paramedics is the AHA's ACLS textbook, that the AHA's standards were included in NCEMS' protocols, that the standard requires "in cases of ventricular fibrillation, patients be defibrillated at the earliest possible moment," and that Belcher was aware of this standard of care. He also stated that "failure to provide [a defibrillating] shock, and the failure to switch to a second defibrillator that was present represents a significant deviation from the standard of care."
 {¶ 66} Dr. John S. MacGregor, whose affidavit was also submitted by appellants, stated that he is a licensed, practicing physician in California, certified in cardiovascular diseases and cardiology, and is also certified in ACLS. This affidavit is likewise replete with legal conclusions; however, he also stated that the "current national standard of care" for EMS personnel is the AHA's ACLS textbook, and his testimony would have established the same standard of care as Haskell and Love. His affidavit concludes that upon a review of documents and depositions, he was of the opinion that "to a reasonable degree of medical certainty that the standard of care was not met in regards to the resuscitation attempt performed on Mr. Mitchell by the staff of [NCEMS]."
 {¶ 67} The trial court's oversight of appellees' experts' depositions is especially interesting due to their substantial agreement with appellants' experts' affidavits regarding the applicable standard of care. Kay Bleecher, appellees' expert witness, holds a bachelor of science in nursing and has been an advanced cardiac life support instructor since 1986, teaching as adjunct faculty at a paramedic program; she had been certified as an "emergency nursing expert" and stated that she is qualified to "diagnose a patient's cardiological condition." She agreed that the standard of care for paramedics caring for a cardiac arrest patient was to follow AHA protocols; all paramedics are trained to follow those protocols, which require three defibrillator shocks to be delivered in quick succession when and if the patient displays ventricular fibrillation. Appellees do not dispute that the AHA protocols regarding the delivery of defibrillating shocks to a cardiac arrest patient constitutes the applicable standard of care for paramedics.
 {¶ 68} With respect to the EMT's and paramedic's failure to employ the LifePack defibrillator as soon as it was on the scene, Bleecher (1) agreed that within five minutes of the second squad's arrival, the Lifepack was on the scene; (2) agreed that the EMTs and paramedics were not "following the course of conduct for EMTs and paramedics"; (3) agreed that the Lifepack was not applied "as quickly as possible"; (4) agreed that the standard of care for a paramedic delivering emergency care to a cardiac arrest patient is the AHA's ACLS protocols; and (5) agreed that the EMTs and paramedics did not follow AHA protocols for delivering three successive shocks to Mr. Mitchell "as soon as they possibly could." Bleecher testified that their repeated use of the Zoll monitor, and their choosing not to use the Lifepack as soon as it became available, was because "they felt that if they used it and played with it, it would shock. It did deliver one shock. Perhaps, if they jiggled and messed around with it, it would deliver another shock." She later acknowledged, however, that the shock that was delivered indicated that the Zoll "was not functioning properly"; Morrow's supplemental run sheet noted that when that shock was delivered, a spark came from one of the patches. When asked how she would instruct her paramedic students in a similar situation, she answered that she would instruct them to troubleshoot a nonworking monitor for "one to two minutes," before switching to another monitor. When asked her opinion as to whether Belcher followed the AHA protocols and standard of care, she stated, "she followed the protocol, but not in a timely fashion." When asked, "When should a patient be defibrillated in a sudden cardiac arrest call, within what time frame?" Bleecher replied, "As soon as you have a functional defibrillator."
 {¶ 69} Appellees' second expert witness, Dr. Barry R. Cover, M.D., testified similarly in deposition; however, his practice is "strictly limited" to internal medicine and he stated that he had no training in cardiology, and had not been a EMS or paramedic, and was not authorized to train, instruct, or test an EMT or paramedic. His work does include "advising" Port Clinton area EMT units by reviewing their EMS protocols. He defined a protocol as "lists of actions that are to be undertaken in specific medical cases"; they are devised and approved by physicians. Cover, as did appellants' experts, also made legal conclusions as to whether the conduct of NCEMS's personnel constituted willful or wanton conduct. However, he had no knowledge of what "specific policies or procedures" NCEMS should have regarding how many defibrillator pads to stock with machines or keep in squad vehicles. He did, however, opine as to why the Zoll monitor failed to work:
 {¶ 70} "[Cover]: I think there was a problem with the pads themselves, that there was not proper patient — there was no proper contact of the pads. Obviously, there was enough contact so that they could gain a reading of the rhythm as they have from the rhythm strips, but without proper total pad contact, they weren't able to deliver the appropriate amount of energy.
 {¶ 71} "[Question]: How do you fix that?
 {¶ 72} "[Cover]: Pads would have to be changed. * * * What I believe happened in this case, these pads have an adhesive backing to them. And when one puts the pad on, once the pad is applied, it's virtually impossible to determine that there's smooth contact throughout that entire surface area. I feel that most likely, at the time the pad was applied, there was an air bubble underneath the pad that could not have been detected without removal of the pad, and that resulted in a lack of surface area; that then resulted in an inability to defibrillate the patient.
 {¶ 73} "[Question]: Why couldn't you just pick up a corner of the pad, push the air bubble out and then reaffix it to the chest?
 {¶ 74} "[Cover]: Because then you destroy the adhesion of the pad.
 {¶ 75} "[Question]: So you need to put a new pad on?
 {¶ 76} "[Cover]: Yes, sir. * * * I don't think there's any way you can check the pads. You just have to make the decision."
 {¶ 77} Testimony was also elicited to demonstrate that the Zoll monitor was able to function both with the adhesive pads, and with "paddles" that would deliver a defibrillating shock. For whatever reason, no paddles were kept with the Zoll monitor or in the squad vehicle; Cover testified that if paddles had been available, it would have taken "thirty seconds at the most" to switch from the pads to the paddles. Cover also testified that (1) when the Lifepack monitor was applied, Mr. Mitchell was still displaying ventricular fibrillation, the "shockable rhythm"; (2) it should take between 30 seconds to three minutes for the squad to switch from the Zoll to the Lifepack; and (3) defibrillation must be delivered within 10 minutes of full cardiac arrest in order for a patient to retain a chance of recovery. Cover also admitted that, apart from other rare methods, the only way a patient will recover from ventricular fibrillation is by a shock from a defibrillator. Cover was also asked to examine appellants' chronology, and was asked at each point whether it was "reasonable" to switch to the Lifepack as soon as it became available:
 {¶ 78} "[Cover]: Yes, I would, yes.
 {¶ 79} "[Question]: And in fact, it's even beyond questioning at that point, you really are questioning whether you have another viable option, aren't you?
 {¶ 80} "[Cover]: I think if you'll notice the time line at that time there was no other viable option. * * *"
 {¶ 81} "[Question]: * * * And if you have a defibrillator that's not working, you tried it twice, and you have another one that's sitting right there that presumably works, there's no reason not to use it, is there?
 {¶ 82} "[Cover]: None that I can think of.
 {¶ 83} "* * *
 {¶ 84} "[Question]: So 17 minutes from arrival, eight minutes from the time the second squad is sent, they arrive, they go to shock and it doesn't work again?
 {¶ 85} "[Cover]: Yes.
 {¶ 86} "[Question]: Any reason you can see at that point why you would not use the Lifepack?
 {¶ 87} "[Cover]: None that I can see, no.
 {¶ 88} "[Question]: In fact, another two minutes goes by and they go to shock him again and I believe at that point there's an arc that occurs?
 {¶ 89} "[Cover]: Right.
 {¶ 90} "[Question]: But it doesn't deliver a shock?
 {¶ 91} "[Cover]: That's the fourth defibrillation, at 12:59 that you're talking about?
 {¶ 92} "[Question]: Right.
 {¶ 93} "[Cover]: Yes.
 {¶ 94} "[Question]: And then I believe they attempted to shock him again at 1:00?
 {¶ 95} "[Cover]: Yes, sir.
 {¶ 96} "[Question]: And it doesn't work. Any reason at that point why you don't use the Lifepack?
 {¶ 97} "[Cover]: I don't know of any, but I'm not testifying as to what their frame of mind was at that time.
 {¶ 98} "[Question]: And I'm not asking you to do that, I'm just asking you to give me any reason why you think you wouldn't use that Lifepack?
 {¶ 99} "[Cover]: No. * * * I know of none."
NCEMS Testimony
 {¶ 100} Donald Ballah was the executive director of NCEMS and was responsible for administering policies and procedures. He had also been a paramedic since 1984. When asked what the "duty of the EMS crew" was, he answered: "The duty to administer the protocols as provided by our Medical Director." He stated that it was the policy of NCEMS to have each squad vehicle stocked with two sets of defibrillator pads. He also stated that it would surprise him if a squad did not have two sets of pads; even if a squad had used a set of pads on a run, they would be expected to restock the squad vehicle with a second set.
 {¶ 101} Ballah also stated that the protocol with respect to defibrillating a patient in cardiac arrest, paramedics were to follow "current ACLS guidelines." He insisted that those protocols were followed. With respect to the crew's choice to continue using the Zoll instead of switching to the available Lifepack, he also acknowledged that (in response to a rather convoluted question regarding the circumstances of the event) he "probably would have asked for the second defibrillator"; however, he would not give an answer as to the point at which he would have switched machines. He agreed that the Lifepack was an "acceptable alternative" to use:
 {¶ 102} "[Question]: * * * am I correct that knowing everything, all the consequences of the patient in v-fib and sudden cardiac arrest, that the two ETMs and the two paramedics made the choice to continue to try to attempt to defibrillate with a non-working machine?
 {¶ 103} "[Ballah] Yes.
 {¶ 104} "[Question]: And the course of conduct, your protocol, your algorithm requires defibrillation three times?
 {¶ 105} "[Ballah]: Yes.
 {¶ 106} "[Question]: And instead, they decided to attempt to defibrillate?
 {¶ 107} "[Ballah]: They were doing their best to accommodate these protocols."
 {¶ 108} Rick Shields was the operations manager for NCEMS at the time of the event, and had been a paramedic with NCEMS since at least 1988. He acknowledged that the policies and procedures for treating a patient in ventricular fibrillation were mandated by AHA; thus he agreed to the same standard of care for paramedics caring for a cardiac arrest patient as appellants' and appellees' expert witnesses.
 {¶ 109} "[Question]: So if you don't administer those shocks, but you have a working monitor there to do so, are your following the protocol?
 {¶ 110} "[Shields]: No, if the monitor wasn't used."
 {¶ 111} Shields then discussed how it was unclear whether, in the intervening times, Mr. Mitchell's heart rhythms were such that it was appropriate to deliver shocks. He acknowledged, however, that the only indication that he was in a "non-shockable" rhythm was at 00:56; this was due to the failure to print an EKG strip from the Zoll monitor and the absence of crew members' notes of any other rhythms. However, when questioned regarding the shock administered with the Zoll monitor at 00:57 (seven minutes after the second squad arrived; eleven minutes before the Lifepack was attached), and asked whether he knew the crews knew that they used a malfunctioning monitor, he responded:
 {¶ 112} "[Shields]: Yes.
 {¶ 113} "[Question]: And they had a different choice, didn't they?
 {¶ 114} "[Shields]: Yes.
 {¶ 115} "[Question]: This can't be anything other than an intentional choice to use that Zoll, can it?
 {¶ 116} "* * *
 {¶ 117} "[Question]: Do you know what intentional means?
 {¶ 118} "[Shields]: Yes.
 {¶ 119} "[Question]: Okay. Do you know what a choice is?
 {¶ 120} "[Shields]: Yes.
 {¶ 121} "[Question]: Okay. Was it an accident that they used the Zoll?
 {¶ 122} "[Shields]: No, it was not an accident that they used the Zoll.
 {¶ 123} "[Question]: That was a choice, an intentional choice that was made * * * ?
 {¶ 124} "[Shields]: Yes."
 {¶ 125} Appellants also filed the deposition transcript of Michael Paplomo, who is a certified paramedic and was previously a NCEMS paramedics' supervisor, and was Belcher and Morrow's supervisor at the time of the event. In contradiction to Shields and Ballah, Paplomo stated that he would usually only stock one set of pads in his equipment, and stated that he was not trained to troubleshoot the Zoll monitors. When asked if, given a situation in which he had a defibrillator with pads that weren't working, what he would do, he replied:
 {¶ 126} "[Paplomo]: I would call another squad.
 {¶ 127} "[Question]: And what would you tell that squad?
 {¶ 128} "[Paplomo]: That I need their monitor.
 {¶ 129} "[Question]: And when that monitor arrived, what would you do?
 {¶ 130} "[Paplomo]: I would use it.
 {¶ 131} "* * *
 {¶ 132} "[Question]: As a supervisor, would you expect your employees to make that same decision you made?
 {¶ 133} "[Paplomo]: You mean paramedic, you're talking about —
 {¶ 134} "[Question]: Right.
 {¶ 135} "[Paplomo]: Yes."
 {¶ 136} Paplomo also stated that he did not think the paramedics under his supervision at the time were trained to troubleshoot, and he would not expect them to be able to troubleshoot. When asked whether, if he had a defibrillator that was not delivering a shock to a sudden cardiac arrest patient, and if there was a backup defibrillator available, he would "spend time troubleshooting the machine that is not working, or would you immediately employ the machine that is working," Paplomo replied that he would use the workable machine. He also acknowledged that, as a paramedic, he would not be following protocol if the shocks were not delivered, and that the shocks should be delivered "as soon as possible."
Analysis
 {¶ 137} Although plaintiffs have pointed to issues of fact, we agree with the trial court that these facts are not material insofar as they fail to create a genuine issue of whether appellees' misconduct was willful or wanton. Each expert and appellees' witnesses testified to substantially the same standard of care for paramedics delivering emergency care to cardiac arrest patients. We emphasize here that the question is whether the acts in breaching that standard of care evidence willful or wanton misconduct. The trial court fittingly characterized the level of care delivered to Mr. Mitchell — particularly in the squad's "choice" to continue to use the Zoll instead of expediently switching to the Lifepack — as negligent and "inept." Further, we agree with the trial court that the mere piling up of negligent acts does not, by virtue of sheer volume, thereby convert negligence into willful or wanton acts.
 {¶ 138} Willful acts are different from negligent acts not in degree, but in kind. Donlin v. Rural Metro Ambulance, Inc. (2004), 11 Dist. No. 2002-T-0148, 2004-Ohio-1704, ¶ 19, appeal denied, (2004)103 Ohio St.3d 1405, citing Roszman v. Sammett (1971), 26 Ohio St.2d 94,96. Synonyms for negligence include "heedlessness, thoughtlessness, inattention, inadvertence, and oversight." Tighe v. Diamond (1948),149 Ohio St. 520, 525. "Wilfulness, on the other hand, implies design, set purpose, intention, deliberation." Walker v. Mid-States Terminal,Inc. (1984), 17 Ohio App.3d 19, 23. "A defendant might be guilty of the grossest negligence, and his acts might be fraught with the direst consequences, without having those elements of intent and purpose necessary to constitute wilful tort." Id. at 23-24.
 {¶ 139} "Negligence" and "wanton" are "mutually exclusive terms, implying radically different mental states." Tighe, supra, at 525-526. In particular, in order to advance issues of wanton misconduct, there must be a "disposition to perversity" on the part of the tortfeasor and such perversity "must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury." Donlin, supra at ¶ 19. Unlike a willful act, intent need not be present for an act to be wanton, but the actor must be conscious that "the probability that harm will result from such failure is great." Id. at ¶ 17.
 {¶ 140} Applying these legal standards to the facts, having construed those facts in a light most beneficial to appellants, we must conclude that the paramedics' acts could not have constituted wanton misconduct. Knowledge that a sudden cardiac arrest patient will, in all probability, suffer great harm from a failure to administer proper care will always exist for every trained paramedic and EMT; thus, this factor carries little weight in circumstances such as these. That is, while the harm may be of greater or lesser degrees in other professions, death is the only certain outcome for paramedics caring for a sudden cardiac arrest patient if proper care is not delivered; this situation demonstrates that even with proper care, the risk of serious injury or death is high; with negligent care, the risk is even greater. Even when all proper choices are made by a paramedic when delivering care in these circumstances, death is still a significant probability. Owing to the specific situations paramedics encounter, we find the trial court's analogies between choices made by an automobile driver to the choices faced by paramedics to be weak ones. Thus, in these circumstances, emphasis may be appropriately placed upon the element of "absence of all care" and "failure to exercise any care." Hypothetically, future facts may be such that some care was rendered, yet the care may be wantonly applied; thus, a grant of summary judgment under this legal standard to these facts does not foreclose this future possibility; however, such is not the case here.
 {¶ 141} Neither can we agree that the acts taken here constitute willful misconduct. Although Shields, NCEMS's operations manager, acknowledged that the paramedics' choices were intentional, we cannot say that "intentional" in the sense of choosing between two course of conduct, given these particular facts, amounts to "design, set purpose, or deliberation." While a choice may be made intentionally, it may be made unreflectively or thoughtlessly; that is, the intention necessary to constitute willful misconduct implies a reflective mental state; these circumstances evidence an unskillful and ineffectual knee-jerk reaction under life and death circumstances. While the consequences of harm in these circumstances is and will always be great, the squad members here continued to deliver care, even though some aspects of the care rendered here can readily be seen as "thoughtless." Nonetheless, "thoughtless" is the opposite of "deliberation."[5]
 {¶ 142} Donlin presented strikingly similar facts. In Donlin, as here, two EMS squads — a primary squad and a "backup" squad — responded to a sudden cardiac arrest call. Appellants disputed the appellee's assertion that the first squad was carrying a defibrillator. Appellees' crew members asserted that they had delivered defibrillating shocks to the decedent within the first few minutes of their arrival on scene. Appellants argued that because their key witness, a police officer on the scene, stated that he saw no paramedic from the first squad use a defibrillator, a genuine issue of fact arose as to whether the paramedics recklessly disregarded treatment protocols and the standard of care by failing to deliver timely shocks. Most notably, as here, there was an absence of rhythm strips from the first defibrillator supposedly used by the first squad; however, rhythm strips did exist from a second defibrillator which evidenced that the second squad delivered defibrillating shocks some 20 minutes "later."[6] That court concluded, "even if the first team of paramedics failed to use or have a defibrillator, that is not per se evidence of willful or wanton conduct."Donlin, supra at ¶ 24.
 {¶ 143} Factually, the only difference is that here, a working defibrillator was on-scene for approximately 20 minutes after the paramedics attempted to use the Zoll unit and it failed twice; hence, there is no dispute that a functioning unit was available, unlikeDonlin. Summary judgment may be rendered on questions of law when there are no disputes of fact that are material to the issue of whether the instant misconduct was willful or wanton. Here, apart from the legal conclusions made by appellants' experts' affidavits, the affidavits characterized the paramedics' choice to continue using the Zoll as "avoidable," "a significant deviation from the standard of care," and "the standard of care was not met." We have here not an equivocation to weigh, which the dissent in Donlin expressly and correctly noted was not permitted on summary judgment; rather, accepting them as true, these statements show that the act of breaching the standard of care does not rise to the level of willful or wanton misconduct. As previously noted,any deviation from the standard of care for paramedics attending to a sudden cardiac arrest patient carries a high probability of significant harm. From this evidence, a court could correctly conclude that the inferences drawn in appellants' favor do not, as a matter of law, create any issues with respect to the legal standard of willful or wanton misconduct on the paramedics' part. The first, fourth and part of the second assignments of error are not well-taken.
II.
 {¶ 144} The remaining portion of appellants' second assignment of error addresses the trial court's denial of appellants' motion to strike portions of Belcher's affidavit due to inconsistencies between her affidavit statements and her deposition. Given the respect to detail with which we considered Belcher's testimony for the purposes of reviewing the grant of summary judgment, we have construed all of Belcher's statements in a light most beneficial to appellants. Moreover, having carefully reviewed Belcher's deposition, we find no inconsistencies between it and her affidavit. Appellants' second assignment of error regarding the denial of their motion to strike is therefore not well-taken.
III.
 {¶ 145} In their third assignment of error, appellants argue that a genuine issue of material fact exists in support of their claim for spoliation of evidence: specifically, that no explanation was given for the disposal of the Zoll unit defibrillator pads; that no explanation was given for the failure to print or retain a code summary or monitoring strips from the Zoll unit; and that no explanation has been made for an alteration of a document titled "Trip Details." Given the facts discussed, supra, we find this claim unsupported by the existence of genuine issues of material fact as well.
 {¶ 146} "Spoliation of evidence has been recognized by the Ohio Supreme Court as an independent cause of action." Keen v. Hardin Mem.Hosp., 3rd Dist. No. 6-03-08, 2003-Ohio-6707, ¶ 10, citing Smith v.Howard Johnson Co., Inc. (1993), 67 Ohio St.3d 28, 29. The elements for a spoliation or destruction of evidence were stated in Smith: "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts * * *." 67 Ohio St.3d at 29.
 {¶ 147} First, there is no evidence that destruction of the Zoll pads was done with knowledge of probable litigation or done willfully. Belcher testified that the Zoll defibrillator pads are adhesive-based and were routinely disposed after use. Appellants have advanced no evidence — from other witnesses, expert or otherwise — that NCEMS practice or standard practice is any different. Belcher did not know whether the crew cleaned up and threw away the pads at the Mitchell residence or whether they were thrown away when she returned the Zoll unit. Regardless, we fail to perceive any reason why Belcher, Morrow, or any other NCEMS employee knew — much less should have known — of a probability of litigation requiring preserving the pads. Moreover, the destruction must have been "designed to disrupt the plaintiff's case"; here, appellants did not file their complaint until nearly two years after the pads were disposed.
 {¶ 148} Second, with respect to the Zoll monitor strips, appellants point to Morrow's deposition testimony wherein she stated that she had seen strips; appellants characterize her testimony as her having acknowledged seeing strips for the entire run. Again, having carefully reviewed Morrow's deposition testimony, we cannot agree. Morrow first stated that she had seen strips for the entire run, saying "they are attached somewhere." When asked, however, whether she had seen strips for the Zoll prior to 12:59, she stated: that she had not seen those, to her knowledge; that strips would not have necessarily been printed from the moment the pads were attached to a monitor since no protocol required them to do so; that although a strip will print automatically once the unit delivers a shock, she was not sure whether it would automatically print upon a failed shock (contrary to appellants' restatement of this same testimony); that although Mr. Mitchell was considered a "code" and "code summary" strips are printed for every code, she had only seen a code summary from the Lifepack, and not from the Zoll.
 {¶ 149} We agree with appellants that the missing strips "disrupted" their case in a common language sense, as questions remain as to what rhythms Mr. Mitchell's heart displayed between the failed use of the Zoll and the attachment of the Lifepack. However, as discussed supra, this is not a genuine issue of material fact, since, even assuming Mr. Mitchell displayed a "shockable" rhythm during those moments, the acts of care undertaken on his behalf rendered appellees' conduct negligent and not willful or wanton. Thus, any disruption caused by the missing strips was not prejudicial or harmful to their case.
 {¶ 150} Third, with respect to the run report, appellees do not dispute — indeed, cannot — that the trip details report was altered. Belcher was married in September of 2002. The notations logged on the trip details report span from October 15, 2001 to August 26, 2003. The EMS run report completed by Belcher and Morrow on the evening of Mr. Mitchell's run shows Belcher's maiden name. Appellees do not dispute that Belcher's maiden name must have been displayed on the trip details report when it was begun; appellees assert, however, that this was a computerized log maintained and continually revised for billing purposes. Indeed, the notations relate to payments and invoices.
 {¶ 151} Appellees have not offered an explanation for why or how Belcher's name was changed. Neither have appellants offered an explanation for how or why this or any other alteration in the trip details report would have benefited their case. The trip details report lists the time Mrs. Mitchell's 9-1-1 call was received, the time the crew was dispatched, the time the squad began transporting Mr. Mitchell to the hospital, and the time the squad arrived at Bellevue with Mr. Mitchell. As discussed, supra, these times have already been construed in a light most beneficial to plaintiff; therefore, even assuming that an absence of an "original" copy of the trip details report was available (or even able to be preserved), appellants have not demonstrated that it was willful "destruction" as opposed to revisions in the ordinary course of the billing business, or that revisions were made with a design to disrupt their case.
 {¶ 152} Construing all inferences in appellants' favor, reasonable minds could come to but one conclusion. Summary judgment to appellees on appellants' claims for spoliation of evidence was therefore proper, and appellants' third assignment of error is not well-taken.
 {¶ 153} For the foregoing reasons, the judgment of the Huron County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Huron County.
Judgment affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4, amended 1/1/98.
Singer, P.J., Pietrykowski, J. Skow, J., concur.
[1] Appellants' references to exhibits and notes have been deleted.
[2] * * * Times are in military time.
[3] Apparently short for "ventricular fibrillation."
[4] R.C. 4765.49(B) provides: "A political subdivision, joint ambulance district, joint emergency medical services district, or other public agency, and any officer or employee of a public agency or of a private organization operating under contract or in joint agreement with one or more political subdivisions, that provides emergency medical services, or that enters into a joint agreement or a contract with the state, any political subdivision, joint ambulance district, or joint emergency medical services district for the provision of emergency medical services, is not liable in damages in a civil action for injury, death, or loss to person or property arising out of any actions taken by a first responder, EMT-basic, EMT-I, or paramedic working under the officer's or employee's jurisdiction, or for injury, death, or loss to person or property arising out of any actions of licensed medical personnel advising or assisting the first responder, EMT-basic, EMT-I, or paramedic, unless the services are provided in a manner that constitutes willful or wanton misconduct."
[5] While advancing evidence of material facts relevant to genuine issues of perversity may be a severely high standard to meet, this is the legal standard with which the Ohio legislature has seen fit to clothe private corporations contracting with political subdivisions to provide public services. Had these same negligent acts been performed by medical providers unbenefitted by the shield of governmental immunity, appellants may have been entitled to some compensation — a difference that is not insignificant since the alleged tortfeasor in both instances would be, but for a contract, non-governmental actors.
[6] "Later" than what is unknown, since the time lapse between missing documentary evidence and available documentary evidence was only mentioned by the dissent.