[Cite as *Herron v. Columbus*, 2016-Ohio-503.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Holly Herron, as Executor of the Estate : 
of Sonia A. Bray, deceased,

                         :

       Plaintiff-Appellant,                     No. 14AP-1063

                         :           (C.P.C. No. 12CV-15238)

v.

                         :          (REGULAR CALENDAR)

City of Columbus c/o Richard 
Pfeiffer, Jr. et al.,                  :

       Defendants-Appellees.       :

---

D E C I S I O N

Rendered on February 11, 2016

---

*Leeseberg & Valentine*, *Gerald S. Leeseberg*, **and** *Craig S. Tuttle*, **for appellant.**

*Richard C. Pfeiffer, Jr.*, **City Attorney, and** *Michael R. Halloran*, **for appellees.**

---

APPEAL from the Franklin County Court of Common Pleas.

BROWN, J.

{¶ 1} Holly Herron, Executor of the Estate of Sonia A. Bray ("Bray"), deceased, plaintiff-appellant, appeals from the judgment of the Franklin County Court of Common Pleas in which the court granted summary judgment to the City of Columbus ("city"), James Hingst, and James Amick, defendants-appellees, on appellant's claims for wrongful death.

{¶ 2} Amick and Hingst (sometimes "appellees") are emergency medical technicians ("EMTs" or "paramedics") employed by the city. On January 31, 2011, Bray was undergoing a mechanical resonance imaging ("MRI") procedure for her hip at an

MRI facility when she signaled to the MRI operator, Shauna Wilson, that she needed to be removed from the MRI machine. Bray had vomited and possibly aspirated the vomit. Another employee of the facility called 911, and Hingst and Amick, among others, responded to the scene. Appellant contends that Hingst and Amick did little to nothing to help Bray for approximately the next ten minutes.

{¶ 3} Paramedics eventually moved Bray to a cot, but she could not be immediately placed into the ambulance due to distress she experienced whenever her legs were raised. After some discussion about the best way to transport Bray, the paramedics loaded Bray into the ambulance. Soon after being placed in the ambulance, Bray slumped over and became unresponsive. Appellant claims Hingst's and Amick's actions in response to Bray's condition in the ambulance were inadequate. Bray died on February 2, 2011 as a result of cardiopulmonary arrest.

{¶ 4} On December 12, 2012, appellant filed a complaint against appellees, Columbus Division of Fire, Michael Ream (an EMT with the Columbus Fire Department), Jeffrey McLain (a firefighter and EMT with the Columbus Fire Department), Stephen Smallsreed (an EMT and firefighter with the Columbus Fire Department), and Lana Moore (a fire captain and EMT with the Columbus Fire Department), asserting claims for survivorship, lack of informed consent, and wrongful death. On August 20, 2014, defendants filed a motion for summary judgment claiming that as a political subdivision and employees thereof, they were immune from liability unless their acts were manifestly outside the scope of employment, they acted with malice, they were reckless, they exhibited willful misconduct, or they acted in bad faith in a wanton manner. Subsequently, appellant dismissed all the defendants except for the current appellees and all her claims except for her survivorship claim.

{¶ 5} On December 1, 2014, the trial court granted appellees' motion for summary judgment. The court found that appellees did not act maliciously or engage in wanton misconduct because they offered care by performing a physical assessment, taking vital signs, administering supplemental oxygen, and attempting proper body positioning. The trial court also found that appellees' conduct was not reckless because there were witnesses who stated that appellees administered oxygen. The court concluded that there were no facts that showed appellees intentionally deviated from a clear duty, deliberately

failed to discharge some duty, or purposefully did wrongful acts with the knowledge that the patient would be injured. Appellant appeals the judgment of the trial court, asserting the following assignment of error:

> The trial court erred in granting summary judgment to Appellees, as they failed to meet their initial burden under Civ.R. 56(C) and because Appellant demonstrated that genuine issues of material fact remain as to whether Appellees['] acts and omissions were more than negligent.

{¶ 6} In her assignment of error, appellant argues that the trial court erred when it granted summary judgment. Summary judgment is appropriate when the moving party demonstrates that: (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the non-moving party, and that conclusion is adverse to the non-moving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, L.L.C.*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 7} When seeking summary judgment on the ground that the non-moving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claims. *Byrd v. Arbors East Subacute & Rehab. Ctr.*, 10th Dist. No. 14AP-232, 2014-Ohio-3935, ¶ 7, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). *See also Lundeen v. Graff*, 10th Dist. No. 15AP-32, 2015-Ohio-4462. The moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the non-moving party has no evidence to prove its case. *Koeppen v. Columbus*, 10th Dist. No. 15AP-56, 2015-Ohio-4463, ¶ 11, citing *Dresher* at 293. Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the non-moving party has no evidence to support its claims. *Dresher* at

293. If the moving party meets its burden, then the non-moving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *Id.* If the non-moving party does not so respond, summary judgment, if appropriate, shall be entered against the non-moving party. *Id.*

{¶ 8} Here, appellant brought claims against appellees for wrongful death. However, R.C. 2744.03(A)(6) grants employees of political subdivisions immunity from liability, unless any of three exceptions to that immunity apply. *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, ¶ 21. Those exceptions are (1) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities (R.C. 2744.03(A)(6)(a)), (2) the employee's acts or omissions were with malicious purpose, in bad faith or in a wanton or reckless manner (R.C. 2744.03(A)(6)(b)), and (3) civil liability is expressly imposed upon the employee by a section of the Revised Code (R.C. 2744.03(A)(6)(c)). In the present case, appellant claims the exceptions in R.C. 2744.03(A)(6)(b) and (c) apply. With regard to subsection (c), appellant points out that R.C. 4765.49(A) expressly imposes liability on an EMT for providing medical services in a manner that constitutes "willful or wanton misconduct," and R.C. 4765.49(B) expressly imposes liability on municipal employers of EMTs. Thus, appellant claims Amick and Hingst can be held liable for their actions or inactions that are completed in a wanton or reckless manner or in a manner that constitutes willful or wanton misconduct.

{¶ 9} The terms used in R.C. 2744.03(A)(6)(b) "are not interchangeable." *Anderson* at ¶ 40. Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury. *Id.* at paragraph two of the syllabus. Wanton misconduct is the failure to exercise "any care" toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result. *Id.* at paragraph three of the syllabus. Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. *Id.* at paragraph four of the syllabus.

{¶ 10} Appellant claims that Hingst and Amick failed to evaluate Bray and treated her in a manner that a reasonable jury could have concluded to have been reckless, willful, or wanton. However, the crux of appellant's argument is that the legal duty to provide "any care," as used by the Supreme Court of Ohio in *Anderson* to define wanton misconduct, requires more than some nominal act by appellees. Appellant maintains that the literal definition of "any care" differs from the legal definition, as this court recognized in *Hunter v. Columbus*, 139 Ohio App.3d 962 (10th Dist.2000), and *Robertson v. Dept. of Pub. Safety*, 10th Dist. No. 06AP-1064, 2007-Ohio-5080.

{¶ 11} In *Hunter*, the city of Columbus and a Columbus firefighter were defendants in an action filed by the estate of a deceased driver of a vehicle who was struck by a Columbus emergency vehicle. The trial court granted the defendants' motion for summary judgment, finding that the firefighter's conduct was not willful, wanton, or reckless. On appeal, this court rejected the trial court's "simplistic analysis" that because the operator of the emergency vehicle had his lights and siren running, he had complied with the requirements of "any care," and, thus, could not be held to be wantonly or recklessly liable. *Id.* at 970. We reasoned that, under that definition, one could drive an emergency vehicle in any manner and not be guilty of wanton or reckless misconduct simply because one had activated the siren and lights. We noted that, merely looking where one is going or applying one's brakes meets the literalistic, but not legal, definition of "any care," and if "any care" is construed in that fashion, the exception becomes virtually meaningless. We explained that the question of whether conduct is willful or wanton, as considered in relation to whether the probability of harm is great and known to the alleged tortfeasor, requires a more substantial analysis than that. We further explained that a court must evaluate each situation on its own unique facts and all of the circumstances existing at the time. Thus, we reversed the trial court's granting of summary judgment.

{¶ 12} In *Robertson*, a state highway patrol trooper was pursuing a vehicle at a high rate of speed and struck another vehicle while crossing through an intersection, killing the driver.  The Court of Claims of Ohio held that, because the trooper engaged in both willful and wanton misconduct, the state highway patrol was liable for the death of the driver. On appeal, we affirmed the Court of Claims. Citing *Hunter*, we explained that

when evaluating whether a situation involves wanton misconduct, a finder of fact must consider the totality of the circumstances. Thus, even if a police officer undertakes some slight measure of caution—such as looking where he is going, activating his lights and siren, or applying his brakes—a finder of fact may still conclude that the officer's actions, when viewed as a whole, exhibit the perversity necessary for wanton misconduct. Applying the guidelines from *Hunter* to the *Robertson* case, we found that the trooper failed to show any care by speeding into an intersection against a red light. We rejected the highway patrol's argument that the trooper showed care by slowing and accessing the situation before entering the intersection, because driving into the intersection at over 70 m.p.h., coupled with knowledge that multiple factors limited the deceased driver's ability to perceive the cruiser and that the driver might enter the intersection, demonstrates a perversity that rose to the level of wanton misconduct. Likewise, we rejected the highway patrol's argument that the trooper showed some care by slowing to at least 40 m.p.h. from his earlier speed of 110 m.p.h. before entering the intersection at over 70 m.p.h. The fact that the trooper could have been driving faster only demonstrated that he could have acted even more perversely than he did, we found. Additionally, we concluded that the trooper did not show care by assessing the intersection before entering it and deeming it safe to proceed because the trooper's wanton misconduct did not stem from his decision to enter the intersection but, rather, from his excessive speed as he did so. Appellant, in the present case, likens appellees' actions as merely making a visual assessment, as in *Robertson*, before continuing in a reckless manner.

{¶ 13} Therefore, with our prior decisions in *Hunter* and *Robertson* in mind, the issue we must address in the present case is whether appellees' acts were significant enough to constitute "any care." Appellant argues in its appellate brief that the trial court's analysis was too simplistic when it determined that appellees' actions, such as making a visual assessment, taking partial vital signs, giving oxygen, and positioning the legs, constituted "any care" such that immunity is warranted. Appellant also points out that, even if oxygen was given, appellees did not administer oxygen until 15 minutes after first identifying Bray's breathing problem, appellees failed to monitor whether the oxygen provided any actual benefit, and appellees failed to follow up with additional necessary treatments when Bray's condition did not improve.

{¶ 14} Appellees counter that they provided sufficient treatment to demonstrate they did not act in a willful, wanton, or reckless manner. In their respective pleadings addressing summary judgment in the trial court, the parties relied on a combination of affidavits and depositions to argue their respective points. After thoroughly reviewing these numerous affidavits and depositions, as well as other proper evidence submitted on the issue of summary judgment, we find there remains a genuine issue of material fact as to whether Amick's and Hingst's actions constituted "any care," and, as such, whether immunity was warranted. To support their respective positions, appellant and appellees submitted the depositions and affidavits of the EMTs and firefighters present at the scene, the MRI facility employees, and their respective expert medical doctors. Amick testified in his deposition that the call was dispatched as a cardiac arrest, but when he and Hingst arrived at the MRI facility, a police officer was at the entrance and told them that the patient was awake and it was not a cardiac arrest. Amick said that he interpreted the officer's statements as warning them they could relax because it was not a cardiac arrest, and Amick speculated that the police officer informed them because he expected them to arrive tense or excited but what had happened was less serious than a cardiac arrest. When they entered the MRI facility, Bray was coughing, but it did not appear to Amick severe or dangerous, and Amick did not consider it an emergency. Bray was conscious, seated upright in a wheelchair, of normal color, and communicating, although with difficulty because of her coughing. Amick saw no reason why they would have needed to establish a proper airway, and Hingst testified that he did not think intubation was necessary because she was managing her airway on her own. McClain testified he would not sedate and intubate a patient if the patient was breathing on her own, even if she had rales and edema.

{¶ 15} At some early point upon his arrival at the MRI facility, Amick heard one of the employees state that Bray had been lying down, she had vomited, and she might have aspirated, so he considered that maybe she had become claustrophobic in the MRI machine, had a panic attack, and vomited, and was coughing to dislodge aspirated vomit. Amick's initial thought was not that she was suffering from an exacerbation of congestive heart failure ("CHF"), because Bray's son, who was present, said she had no history of heart problems. Hingst testified that Bray was talking, but not much because she was

coughing, so he asked staff and family about her situation so she could have time to calm down and relax. During this time, Hingst said he and the other paramedics discussed why there was fluid in her lungs. Hingst considered using a continuous positive airway pressure ("CPAP") machine, but it was reported that she had vomited, which is a contraindication for CPAP. Also, although Amick did not witness it personally, he said the run report indicated that Bray was given a nose cannula and oxygen. Hingst stated that they put a blood pressure cuff on her shortly after they arrived on the scene, they used a stethoscope to read her blood pressure, gave her oxygen using an oxygen bottle and non-rebreather mask, and assessed her lungs with the stethoscope. Hingst said that, after Bray was given oxygen, she looked like she was doing okay, and she told him she was feeling better.  They took her vital signs within the first ten minutes of arriving on the scene.

{¶ 16} Hingst said that when Bray was told she was going to the hospital after about ten minutes, she stood up, walked to the cot on her own, and sat on the cot. She exhibited no breathing problems or discomfort when she moved onto the cot. After her legs were extended upward on the cot to place her in the ambulance, however, she indicated to him that she wanted her feet to be let down, and once they put her feet back down, she was able to speak again and her breathing eased. Hingst said that she had the oxygen and non-rebreather mask on during this whole period. Amick and Hingst then discussed solutions to this problem. In her deposition, Moore concurred that this issue and the subsequent discussions regarding their options delayed Bray's transport, but she did not believe the call was moving any slower than normal, and the amount of time they spent on the scene was reasonable. Ream and McClain also testified that they observed the actions at the scene, and did not believe the run was any different or slower than their typical run. Hingst and Amick placed Bray in the ambulance about ten minutes after she first got on the cot.

{¶ 17} However, appellant presented evidence that, when construed most strongly in her favor, raised genuine issues of material fact. Appellant's medical expert, Dr. Keith Wesley, testified at his deposition that appellees failed to properly assess and detect CHF, and they failed to treat Bray's respiratory distress, which led to cardiorespiratory arrest and her eventual death.  He said none of the records showed that the paramedics actually spoke directly to Bray to discover her chief complaint. Appellees failed to obtain Bray's

pulse oximetry and capnography, and failed to connect her to a cardiac monitor, which is standard protocol when a patient is having difficulty breathing and has a fast heartbeat. By continuous use of oximetry and capnography, appellees would have been able to judge urgency and measure breathing improvement or deterioration without merely guessing. Dr. Wesley stated that a cardiac monitor was important because one of the earliest signs of someone going from respiratory distress to failure is an increasing heart rate. Without the use of capnography, cardiac monitoring, or pulse oximetry, one would not know if Bray's breathing difficulties were from CHF or something related to her recent history. If measurements are deteriorating, appellees could have used a bag valve mask or intubation. With regard to her respiratory distress, Dr. Wesley testified that appellees should have applied CPAP and then administered furosemide to remove fluid from Bray's lungs and albuterol to reduce broncospasm and improve ventilation. Appellees' contention that they did not apply CPAP because it was contraindicated by vomiting was unfounded, Dr. Wesley stated, because no one confirmed such with Bray or examined the expelled material, the color of which was more consistent with pulmonary edema fluid than vomit. Dr. Wesley said that the duration appellees were on the scene was not so much of a factor as the fact that they accomplished very little during their time on the scene. Dr. Wesley also testified that appellees should have pointed toward CHF as a diagnosis when Bray could not breathe when they raised her legs on the cot, because the raising of legs puts pressure on the heart and causes difficulty breathing. Dr. Wesley opined that appellees' actions were reckless because of their failure to adhere to a number of protocols.

{¶ 18} Shauna Wilson, an MRI technician at the MRI facility at issue, averred that when the paramedics initially arrived, they simply stood around and asked her what had happened without providing any care to Bray. She averred that, despite the fact that one of the paramedics initially criticized workers at the facility for not having taken Bray's vital signs, appellees took no vital signs until over 15 minutes after they arrived, and that was only after Wilson demanded that they do so. Only one paramedic talked to Bray, and that was only very little, while the other paramedics and firefighters stood several feet away. Bray was unable to talk to the paramedic because she could not breathe, sounded as if she had fluid in her lungs, and was coughing constantly. Wilson averred that appellees put

Bray on oxygen via nasal cannula and took her blood pressure, but that was 15 minutes after arriving. She said that no one used a stethoscope to listen to Bray's lungs, hooked her up to an EKG monitor, checked her pulse oximetry, checked her pulse, tried to start an IV, or tried to intubate Bray. She averred that appellees did not demonstrate a serious attitude toward Bray, did nothing to evaluate Bray without Wilson asking them to do so, and exhibited a total lack of regard for Bray's health and breathing problems.

{¶ 19} Kathy Jordan, a patient coordinator at the MRI facility, averred that she never saw anyone take Bray's blood pressure, use a stethoscope, hook up an EKG monitor, do a pulse oximetry, take her pulse, or start an IV. She never saw Bray speak, and Bray was constantly coughing and having trouble breathing. Jordan averred that she had witnessed paramedics care for patients at the facility four or five times, and the paramedics in those cases immediately took over care of the patient, unlike the present case. Jordan averred that appellees showed no regard for Bray's health or her breathing problems.

{¶ 20} After viewing the foregoing evidence in favor of appellant, we find there remain genuine issues of material fact. The affidavit and deposition testimony of Dr. Wesley, Jordan, and Wilson suggest that appellees had a lax attitude in approaching the care of Bray. Jordan and Wilson indicated that appellees acted with no sense of urgency and spent little time interacting with Bray to determine her medical needs. Dr. Wesley's review of the records supported their view that appellees spent no time communicating directly with Bray. Appellees' lack of urgency, which we must assume upon summary judgment, is directly related to Dr. Wesley's criticism that appellees' failure to use oximetry, capnography, and cardiac monitoring rendered them unable to discern the urgency of the situation and measure breathing improvement or deterioration. If the measurements were deteriorating, according to Dr. Wesley, appellees could have used a bag valve mask or intubation. Amick testified that the situation did not appear to be dangerous or an emergency, but this conjecture could have been verified or invalidated by utilizing the proper diagnostic and monitoring equipment. It was appellees' unresponsive conduct that led to their failure to treat her respiratory distress, which in turn led to cardiorespiratory arrest and Bray's eventual death, according to Dr. Wesley. Appellees' nonchalant approach was also demonstrated by their failure to make any effort to

discover whether Bray had actually vomited or was coughing up pulmonary edema fluid. Dr. Wesley testified that the description of the coughed-up material was consistent with pulmonary edema fluid, which would have eliminated appellees' assumption that vomit prevented them from utilizing CPAP. Given Amick's testimony regarding the false description of the call as a cardiac arrest situation, and the police officer's warning to them that, in fact, it was not a cardiac arrest but, instead, something less serious, appellees could have been lulled into a false sense that Bray's condition was not serious or an emergency. Whatever the basis for their inaction in assessing, diagnosing, and treating Bray's condition, construing Jordan's, Wilson's, and Dr. Wesley's testimony in appellant's favor, as we are required to do, we find there remain genuine issues of material fact as to whether appellees' actions constituted "any care," and, as such, whether immunity was warranted.

{¶ 21} We also note that appellant contends that our decision in *Blair v. Columbus Div. of Fire*, 10th Dist. No. 10AP-575, 2011-Ohio-3648, demonstrates what level of care by paramedics is sufficient to meet the legal definition of "any care." In *Blair*, appellant points out, the paramedics obtained a full set of vital signs, provided a nebulizer treatment for the patient's breathing difficulties, provided supplemental oxygen via a non-rebreather mask, connected the patient to an EKG monitor to measure heart rate and other vital signs, attempted to use capnography, and attempted intubation. In *Blair*, the patient had been having breathing problems since the night before, her breathing problems had not improved since the prior night, and she had a known history of asthma and chronic obstructive pulmonary disease. The paramedics initiated a nebulizer mask to provide "some quick relief" based on the diagnosis of a moderate asthma attack. *Id.* at ¶ 4. When the nebulizer proved to provide insufficient relief, paramedics utilized a non-rebreather mask. When the patient's condition continued to decline, paramedics connected her to an EKG monitor. A paramedic then listened to her breathing and heard rales, leading him to consider CHF as a diagnosis. Because the patient then went unconscious, the paramedics decided against using CPAP. Paramedics then attempted to establish an airway via intubation but were unsuccessful at placing it in the trachea, and the patient vomited. After the patient showed a straight line cardiac rhythm with no electrical activity, they performed CPR. They then attempted a second intubation and

tried to use capnography to verify the placement of the tube in the trachea, but the capnography function was disabled on the machine. At that point, they had arrived at the hospital, so they took no further actions to confirm tube placement.

{¶ 22} Although we agree with appellant that *Blair* provides insight into what level of care by paramedics is sufficient to meet the legal definition of "any care," we cannot say it establishes the minimum level of care that is sufficient to constitute "any care." The patient in *Blair* had a different history than Bray, and the paramedics in *Blair* were presented with different circumstances that led them to take the actions they did. Therefore, because these types of cases are necessarily fact-driven, and the underlying facts in *Blair* and the present case are markedly different, we find *Blair* of little comparative use here.

{¶ 23} Appellant also argues that reasonable minds could conclude appellees acted in a reckless manner. As mentioned above, Dr. Wesley opined that appellees acted in a reckless manner, and for the same reasons explained above, we find there remain genuine issues of material fact as to whether appellees acted in a reckless manner in their treatment of Bray. Reasonable minds could come to different conclusions as to whether appellees exhibited indifference in their treatment of Bray by failing to treat Bray's condition with urgency. There remains a question as to whether a reasonable person would have realized that there was an obvious risk of harm by failing to treat Bray's symptoms as an emergency and failing to use oximetry, capnography, and cardiac monitoring to determine the seriousness of the situation. Appellees' indifference, as portrayed by Jordan's and Wilson's averments that appellees provided no care or treatment to Bray for the first 10 to 15 minutes, prevented appellees from providing Bray medical treatment to stop the progression of her respiratory distress. Likewise, appellees' indifference toward investigating her alleged vomiting also prevented them from properly diagnosing Bray's condition and providing her treatment. Therefore, construing the evidence most strongly in favor of appellant, we conclude there remain genuine issues of material fact as to whether appellees' actions constituted reckless conduct, and, as such, whether immunity was warranted.

{¶ 24} Furthermore, R.C. 4765.49(B) provides immunity to political subdivisions performing emergency medical services. A plaintiff may overcome the statutory grant of

immunity in cases where "the services are provided in a manner that constitutes willful or wanton misconduct." Given our reversal of summary judgment with regard to Hingst and Amick, the city was also not entitled to summary judgment on the issue of immunity. Therefore, the trial court erred when it granted summary judgment to the city. For all the foregoing reasons, we find the trial court erred when it found there remained no genuine issues of material facts as to whether Hingst, Amick, and the city were entitled to immunity, and the trial court erred when it granted summary judgment to appellees. Thus, appellant's assignment of error is sustained.

{¶ 25} Accordingly, appellant's assignment of error is sustained. The judgment of the Franklin County Court of Common Pleas is reversed, and the matter is remanded to that court for further proceedings in accordance with law, consistent with this decision.

*Judgment reversed and*
*cause remanded.*

BRUNNER and HORTON, JJ., concur.

_____