[Cite as *Tillman v. Mantz*, 2022-Ohio-2527.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

Cynthia Tillman, Administrator of the
Estate of Eric P. Tillman, et al.

Court of Appeals No. E-21-042

Trial Court No. 2019 CV 0199

    Appellants

v.

Kelly M. Mantz, et al.

**DECISION AND JUDGMENT**

    Appellees

Decided: July 22, 2022

* * * * *

Mark E. Stephenson, for appellants.

Teresa L. Grigsby and Jennifer A. McHugh, for appellees,
Fisher-Titus Affiliated Services, d.b.a. North Central EMS,
Dana Brown, and Amanda Hanneman.

* * * * *

**ZMUDA, J.**

**{¶ 1}** This matter is before the court on appeal from the judgment of the Erie

County Court of Common Pleas granting the motion for summary judgment of appellees

Fisher-Titus Affiliated Services, d.b.a. North Central EMS (NCEMS), Dana Brown, and

Amanda Hanneman and dismissing the claims of appellants Cynthia Tillman, personally, and Cynthia Tillman as administrator of the estate of Eric Tillman. Finding summary judgment is appropriate in this case, we affirm.

## I.     Facts and Procedural Background

{¶ 2} On April 9, 2017, Cynthia Tillman, and her husband, Eric, both sustained serious injuries as a result of a "t-bone" collision with the vehicle of Kelly Mantz at the intersection of State Route 113 and State Route 61 in Erie County. Mantz failed to yield at the intersection and pulled into the path of the Tillman's motorcycle, traveling around the posted speed of 55 m.p.h. Both the driver, Eric Tillman, and his passenger, Cynthia Tillman, were thrown from the motorcycle. The deputy who arrived first at the scene recognized a motorist who had stopped for the accident as a nurse-practitioner. He asked for her opinion regarding the couple's condition, and she indicated the couple's injuries could be life-threatening. The deputy conveyed this information to the sheriff's department
dispatcher.

{¶ 3} Fisher-Titus Affiliated Services, d.b.a. North Central EMS (NCEMS) sent two ambulances to the scene. Paramedic Dana Brown and EMT-basic Amanda Hanneman received the call around 5:11 p.m., and Brown requested a Life Flight helicopter while en route, based on the report of an "auto vs. motorcycle" accident and his knowledge of the traumatic injuries that often result. Brown and Hanneman arrived

2.

on scene within minutes. Brown attended to Eric Tillman, while Hanneman attended to Cynthia Tillman. At Brown's request, Hanneman requested a second helicopter. The NCEMS protocol did not require a call to medical control for permission prior to a request for Life Flight.[1]

{¶ 4} A second ambulance soon arrived, and paramedic Mathew Knowlton took over primary care of Cynthia Tillman, with Hanneman's assistance, and EMT-basic Kellie Deulley assisted Brown with Eric Tillman.

{¶ 5} Around 5:26 p.m., NCEMS dispatch communicated to their personnel on scene that the first helicopter was in the air. At 5:31 p.m., dispatch indicated two helicopters were on the way, with the first estimated to arrive in 7-8 minutes. The two Life Flight helicopters arrived within minutes of each other.

{¶ 6} In tending to Eric Tillman, Brown began his assessment upon arrival at the scene, around 5:25 p.m. He determined Eric Tillman had some bleeding from his head and exhibited confusion and other symptoms indicative of a head injury. Brown learned from officers at the scene that the patient had lost consciousness briefly, but Eric Tillman was conscious when Brown observed him. He was wearing a helmet, which remained intact, and bleeding from the head was controlled.

---

[1] The NCEMS manual generally requires contact with medical control prior to administering certain medications and for treating certain patients, such as those experiencing chest pain or giving birth. For trauma patients, the protocol requires contact with medical control "as needed."

3.

{¶ 7} At around 5:30 p.m., Brown inserted two IV lines. At approximately 5:34 p.m., Brown took Eric Tillman's vitals, which suggested his condition was stable. He then placed Tillman in a C-collar. After assessing his abdominal abrasions, Brown noted a lack of outward injury, but suspected internal injury after Tillman indicated pain in his pelvic area upon palpation. Internal injury suggested his overall condition was not stable, but Brown believed he was hemodynamically stable, based on his vitals, with proper blood flow, blood pressure, and heart rate. Brown rolled Eric Tillman to check for noticeable spinal injuries, open fractures, or cuts, and then placed him on a back board with Duelly's help. Brown also placed a monitor, which provided Tillman's heart rate. Based on his experience and training, Brown believed that Tillman needed a Level I trauma hospital due to suspected head/neural injuries and internal injuries. Brown completed preparing Tillman for transport and took him to the ambulance to await the arrival of the helicopter, which was reported to be three minutes out. His heart rate was recorded as 128 beats per minute at the time the Life Flight crew arrived at 5:53 p.m. Brown transferred care of Eric Tillman to Life Flight at 5:56 p.m.

{¶ 8} Knowlton attended Cynthia Tillman, who had an open fracture to her leg, among other injuries. Cynthia was transported in the first helicopter, which arrived around 5:40 p.m. and took off around 5:50 p.m., and Knowlton then went to help Brown

4.

with Eric Tillman.[2]  He noted Eric Tillman was conscious but confused, and Knowlton

had to work to keep him from getting up and removing his IV lines.  Meanwhile,

Hanneman left Cynthia Tillman and checked on Mantz and a passenger in Mantz's car.

{¶ 9} After taking over care, the Life Flight crew determined that Eric Tillman

was not ready for flight, and they spent additional time prepping him.[3]  The Life Flight

registered nurse and EMT-paramedic performed their own assessment and took Tillman's

vitals, then chemically sedated and intubated him.  They moved Tillman to the helicopter

at 6:20, and took off at 6:33 p.m., arriving at Mercy Health St. Vincent Medical Center at

7:04 p.m.  Throughout their care, they took periodic readings of Tillman's vitals, and his

condition gradually worsened.  By the time Tillman arrived at the hospital, he needed

CPR.  The crew transferred care to the emergency room physician at 7:13 p.m., and

resuscitation attempts continued, but Tillman succumbed to his injuries shortly after

---

[2] Appellants do not challenge the decision to send Cynthia Tillman on the first helicopter, and there is no definitive reasoning provided within the testimony of first responders regarding this decision.  Knowlton testified that there was not much that could be done to further stabilize Cynthia, stating "[w]ith the open leg fracture and her ability to maintain, you know, bleed control, we all felt that it was straight to Level I trauma center."

[3] The record contains no evidence regarding a reason Eric Tillman was "not ready" for transport.  The sole indication of readiness appears in the Life Flight patient care report, attached as an exhibit to Brown's deposition transcript.  The report contains a data field for "scene delay" and the entry "Patient Not Ready Other (Not Listed)."  The narrative portion of the report does not address readiness or delay, and there is no testimony of any Life Flight crew regarding this notation.

reaching the hospital. The coroner determined the cause of death as multiple blunt force injuries.

{¶ 10} On April 8, 2019, appellants filed a wrongful death suit, naming appellees as well as Mantz, and the hospitals, physicians, and Life Flight crews who also provided care. On August 26, 2020, appellants filed an amended complaint against Mantz, NCEMS, Brown, and Hanneman, and dismissed the remaining previously named defendants from the suit. Appellant alleged claims for wrongful death and negligence against Mantz, and alleged claims for wrongful death against Brown and Hanneman, individually, and against NCEMS based on respondeat superior for the conduct of their employees, including Brown and Hannaman.

{¶ 11} On October 21, 2020, NCEMS, Brown, and Hanneman moved for summary judgment, arguing they were statutorily immune from suit lacking any evidence of willful or wanton conduct. Appellants filed an opposition brief, and separately filed a dismissal of Hanneman, without prejudice, pursuant to Civ.R. 41(A)(1)(a). After appellants filed their opposition brief to the motion for summary judgment, appellees filed a notice of filing a supplemental motion for summary judgment with additional argument regarding the statute of limitations. Appellants filed their opposition to the supplemental motion, and appellees filed a reply brief. On September 30, 2021, the trial court entered summary judgment in favor of NCEMS, Brown, and Hanneman by order,

6.

reciting "good cause shown." The trial court dismissed the amended complaint against these defendants with prejudice.

{¶ 12} Appellants' claims against Mantz remained pending, and so they requested Civ.R. 54(B) language in order to make the trial court's decision on summary judgment immediately appealable. On October 29, 2021, the trial court entered an order *nunc pro tunc,* including Civ.R. 54(B) language and reciting "no just reason for delay." This appeal followed.

## II. Assignments of Error

{¶ 13} Appellants now challenge the judgment, asserting a single assignment of error:

THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF FISHER-TITUS AFFILIATED SERVICES, D.B.A. NORTH CENTRAL EMS, DANA BROWN, AND AMANDA HANNEMAN.

## III. Analysis

{¶ 14} Although appellants assert a single assignment of error, the parties present numerous issues within their respective briefs, relative to summary judgment. Issues raised include the effect of appellant's notice dismissal of Hanneman, appellees' statute of limitations argument, and the immunity determination as to Brown, personally, and NCEMS, based on respondeat superior. We address each of these issues in turn.

7.

## A.    Dismissal of Hanneman

{¶ 15} The trial court granted judgment in favor of appellee, Amanda Hanneman, as part of its order granting summary judgment, and dismissed appellants' claims against her with prejudice.  However, appellants dismissed their claims against Hanneman without prejudice, pursuant to Civ.R. 41(A)(1)(a), by separate notice, filed contemporaneously with their opposition brief  on December 14, 2020, prior to the court's ruling.  A voluntary dismissal under Civ.R. 41(A) nullifies the suit with respect to the party dismissed.  *Denham v. New Carlisle,* 86 Ohio St.3d 594, 597, 716 N.E.2d 184 (1999).  Therefore, to the extent the trial court dismissed the claims against Hanneman in its entry of judgment, those claims were no longer pending and the trial court lacked the ability to adjudicate such claims.  *See, e.g., Zimmie v. Zimmie,* 11 Ohio St.3d 94, 95, 464 N.E.2d 142 (1984) ("It is axiomatic that such dismissal deprives the trial court of jurisdiction over the matter dismissed.").

{¶ 16} As a consequence of voluntarily dismissing the claim against Hanneman, appellees argue that this dismissal also negated the claims against NCEMS arising from Hanneman's conduct.  However, it is well-settled law that in cases alleging "the wrong of a servant acting within the scope of his [of her] authority, the plaintiff has a right of action against *either* the master *or* the servant, *or* against both."  *Tisdale v. Toledo Hosp.,* 197 Ohio App.3d 316, 2012-Ohio-1110, 967 N.E.2d 280, ¶ 15 (6th Dist.), quoting *Losito v. Kruse,* 136 Ohio St. 183, 187, 24 N.E.2d 705 (1940) (emphasis sic.).  Thus, appellants'

8.

original claims against Hanneman, personally, are not part of this appeal, but the claims against NCEMS based on Hanneman's alleged conduct remain.

{¶ 17} Upon review of the record, it appears Hanneman was the only first responder, sent by NCEMS, who did not provide care to Eric Tillman. Additionally, appellants' expert did not opine on Hanneman's conduct, omitting her entirely from his affidavit after reviewing the records and testimony related to Eric Tillman's care. Accordingly, in considering only those claims against NCEMS based on Hanneman's alleged conduct, it appears no conduct of Hanneman supports the claims. Therefore, while the dismissal of Hanneman did not negate claims against NCEMS, the lack of factual support does eliminate Hanneman as a basis to impose liability on NCEMS based on the theory of respondeat superior. Concerning Hanneman, appellants are correct in theory, but appellees prevail on the facts.

### B.    Statute of Limitations

{¶ 18} As one basis for summary judgment, appellees argued the wrongful death suit of appellants was time-barred, based on the statute of limitations for medical claims, R.C. 2305.113. In response, appellants argued the statute of limitations for a wrongful death suit is two years, as provided by R.C. 2125.02(D).

{¶ 19} A wrongful death claim, which is a special statutory action, and the underlying injury claim, existing at common law, arise from the same wrongful act but are distinct and separate. (Citations omitted.) *Klema v. St. Elizabeth's Hosp. of*

9.

*Youngstown*, 170 Ohio St. 519, 521, 524, 166 N.E.2d 765 (1960).  Appellants filed a wrongful death suit, seeking damages based on the wrong to Eric Tillman's beneficiaries, and not a malpractice suit, seeking damages based on his own injuries prior to his death. *Koler v. St. Joseph Hospital*, 69 Ohio St.2d 477, 479, 432 N.E.2d 821 (1982), citing *Klema* at 521.  Accordingly, the statute of limitations for a medical claim did not apply, and appellants filed suit within the required time.  Appellees, accordingly, were not entitled to summary judgment based on their statute of limitations argument.

## C. Statutory Immunity

{¶ 20} The trial court granted summary judgment in favor of Brown and NCEMS for "good cause shown."  While the trial court did not provide a basis for the judgment, beyond "good cause," appellees moved for judgment based on immunity as well as the statute of limitations.  Having found the statute of limitations permitted appellants' suit, we address summary judgment based on immunity.

{¶ 21} We review the decision to grant summary judgment de novo, applying the same standard as the trial court.  *See Mitchell v. Norwalk Area Health Serv.,* 6th Dist. Huron No. 2005-Ohio-5261, ¶ 8, citing *Smiddy v. The Wedding Party, Inc.,* 30 Ohio St.3d 35, 36, 506 N.E.2d 212 (1987).  Summary judgment is proper when no genuine issues of material fact remain, and after construing the evidence in favor of the nonmoving party, it is clear that reasonable minds can only conclude that the moving party is entitled to

10.

judgment as a matter of law. *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978); Civ.R. 56(C).

{¶ 22} The moving party bears the initial burden of demonstrating an absence of issues of genuine fact. *Dresher v. Burt,* 75 Ohio St.3d 280, 294, 662 N.E.2d 264 (1996). Once the moving party satisfies this burden, the nonmoving party has a reciprocal burden, and must demonstrate specific facts, through proper evidence, showing there are genuine issues for trial. Civ.R. 56(E).

{¶ 23} Appellants asserted a wrongful death claim against Brown, based on his own conduct, and against NCEMS, based on the conduct of Brown and others in their employ. As previously noted, appellants could proceed against NCEMS without also filing suit against the individuals acting on its behalf. *Tisdale,* 197 Ohio App.3d 316, 2012-Ohio-1110, 967 N.E.2d 280, at ¶ 15, quoting *Losita*, 136 Ohio St. at 187, 24 N.E.2d 705.

{¶ 24} Appellees sought summary judgment based on statutory immunity. R.C. 2744.02(A)(1) establishes a general grant of immunity to political subdivisions, with potential exceptions "when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code." *Riffle v. Physicians & Surgeons Ambulance Serv., Inc.,* 135 Ohio St.3d 357, 2013-Ohio-989, 986 N.E.2d 983, ¶ 22, quoting R.C. 2744.02(B)(5). There are two sections under R.C. 4765.49 that provide exceptions to immunity.

11.

**{¶ 25}** As to Brown, R.C. 4765.49(A) provides an exception to immunity for injury "resulting from their acts or omissions in the performance of their duties," only where "the act or omission constitutes willful or wanton misconduct." Pursuant to R.C. 4765.49(B), NCEMS is entitled to immunity based on the conduct of its first responders, unless the emergency medical services "are provided in a manner that constitutes willful or wanton misconduct." *Riffle* at ¶ 22. Thus, unless the conduct of Brown, Hanneman, Knowlton, and/or Duelley was willful or wanton, Brown and NCEMS are entitled to immunity for acts or omissions of its employees. *See Id.* at ¶ 24.

**{¶ 26}** Courts apply a three-tiered analysis to statutory, governmental immunity determinations. (Citations omitted) *Ogburn v. City of Toledo,* 2019-Ohio-163, 131 N.E.3d 362, ¶ 16 (6th Dist.). First, a court must find that the political subdivision has immunity under R.C. 2744.02(A). *Id.* If immunity does apply, a court must next consider whether an exception to immunity applies, as provided by R.C. 2744.02(B). *Id.* If an exception does apply, the third tier requires consideration of whether the political subdivision is able to assert a statutory defense under R.C. 2744.03, restoring its immunity. *Id.*

**{¶ 27}** The parties agree that Brown and NCEMS have immunity, pursuant to R.C. 2744.02 and R.C. 4765.49, satisfying the first tier of the analysis. As to the second tier, the exceptions to immunity, the parties appear to agree on the facts relevant to the timeline and actions taken by Brown and other NCEMS personnel. The main dispute

12.

centers on the significance of these facts, and whether these facts demonstrate issues of material fact regarding an exception to statutory immunity based on willful and/or wanton misconduct.

{¶ 28} Appellants argue that Brown and other NCEMS employees caused the death of Eric Tillman "through the willful and/or wanton misconduct of the employees of [NCEMS] including, but not limited to, [Brown]."[4] Appellants argue that Brown violated NCEMS's trauma triage protocols and R.C. 4765.40(D) by failing to take Eric Tillman to the Level III trauma center approximately 15 minutes from the scene for assessment and stabilization, thus demonstrating willful misconduct. Appellants further argue that Brown and other NCEMS employees provided deficient care, based on their failure to contact a physician for instruction or guidance and a failure to obtain proper vital signs and convey information to the Life Flight crew. As a result, appellants argue, the lack of "significant" care equated to a lack of any care, demonstrating wanton misconduct.

{¶ 29} Appellants support their assertions with the expert affidavit of Jeff Durgin, M.D., who opined that a reasonably prudent paramedic or EMT would have taken vital signs at least once every 15 minutes, and the standard of care required the NCEMS team to transport Mr. Tillman to the Level III trauma center for stabilization. Dr. Durgin had

---

[4] Appellants further argued that NCEMS and Brown were liable based on the "reckless acts and/or omissions of [Brown]." However, R.C. 4765.49(B) creates an exception to immunity for willful and wanton conduct, and not reckless conduct. *See Riffle,* at ¶ 22-24.

13.

no opinion regarding Brown's role in contributing to Life Flight's delay in transport, but he concluded that the emergency services provided were done so "in a manner consistent with willful misconduct," leading to the death of Mr. Tillman.

{¶ 30} "Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Anderson v. Massillon,* 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 32, citing *Tighe v. Diamond,* 149 Ohio St. 520, 527, 80 N.E.2d 122 (1948); *Black's Law Dictionary* 1630 (8th Ed.2004). "The intention relates to the commission of wrongful conduct, independent of the intent to use certain means with which to carry out such conduct." *Peoples v. Willoughby,* 70 Ohio App.3d 848, 851, 592 N.E.2d 901 (11th Dist.1990), quoting *Tighe* at 526-527.

{¶ 31} "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson* at ¶ 33, citing *Hawkins v. Ivy,* 50 Ohio St.2d 114, 117-118, 353 N.E.2d 367 (1977); *Black's Law Dictionary* 1613-1614 (8th Ed.2004). Wanton misconduct requires more than mere negligence, reflecting a reckless indifference and "a disposition to perversity * * * under such conditions that the actor must be conscious that his conduct will in all probability result in injury." (Citations omitted) *Fabrey v. McDonald Village Police Dept.,* 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994).

14.

{¶ 32} In arguing a lack of immunity, appellants essentially criticize Brown's decisions in providing care and his decision to send Mr. Tillman to a Level I trauma center by Life Flight, rather than drive him to a Level III trauma center to be followed by transport to a Level I facility. Appellants do not dispute Brown's testimony regarding the sequence of events or the care provided, but instead disagree with his choices, relying on Dr. Durgin's opinion regarding the standard of care as to some of those choices and the doctor's conclusion of willful misconduct.

{¶ 33} In addition to Brown's decision to call Life Flight, appellants specifically challenge Brown's alleged failure to call medical control for direction prior to that call, as well as his alleged failure to prepare Mr. Tillman for flight, arguing this failure caused the delay in take-off. Dr. Durgin did not address this conduct within his expert opinion. The applicable standard of care for a paramedic is not within a layperson's knowledge, and therefore, demonstrating the appropriate standard of care requires expert testimony. *Brannan v. Scioto Cty.,* 2014-Ohio-4453, 20 N.E.3d 1098, ¶ 46 (11th Dist.), citing *Bruni v. Tatsumi,* 46 Ohio St.2d 127, 130, 346 N.E.2d 673 (1976) (additional citation omitted.). Therefore, to the extent appellants argue conduct beyond the scope of their expert opinion, we do not consider such argument to be evidence of an exception to immunity. *See, e.g., Wright v. Hamilton,* 141 Ohio App.3d 296, 302, 750 N.E.2d 1190 (12th Dist.2001), citing *Bruni* at 130 ("expert testimony is necessary to establish the appropriate standard of care.")

15.

**{¶ 34}** Within his affidavit, Dr. Durgin indicated his review of the records and deposition testimony of Brown and his colleagues, and he opined on the care of Mr. Tillman, based on his qualifications and medical probability, as follows:

The standard of care of a reasonably prudent EMT-paramedic and reasonably prudent EMT-basic required Dana J. Brown, Kellie A. Deulley and/or Matthew M. Knowlton take vital signs from Eric P. Tillman per established EMS protocols;

[NCEMS] Standards of Care states that vital signs should be taken every 15 minutes on hemodynamically stable patients and every 5 minutes on hemodynamically unstable patients;

Review of the medical records from the scene show that vital signs were taken only once by Dana J. Brown at [5:34 p.m.];

Dana J. Brown testified in his deposition that Mr. Tillman was too injured to go to the Level III trauma center Fisher-Titus Medical Center and required transfer to a Level I trauma center in Toledo;

Matthew M. Knowlton testified in his deposition that Mr. Tillman had 'potential internal hemorrhage, internal bleeding' and that his abdomen 'felt and looked distended';

Later on Mr. Knowlton went on to say Mr. Tillman's abdomen was 'rigid';

16.

The standard of care was violated in this case, as Mr. Tillman was in fact in critical condition with potential internal hemorrhage and hypovolemic shock;

Mr. Tillman should have had vital signs taken at least every 15 minutes;

However, with Mr. Tillman's constellation of injuries and the description of Mr. Tillman's clinic condition by Mr. Knowlton, it is my opinion that Mr. Tillman was in critical condition (as described above) and should have had vital signs taken every 5 minutes while on the scene;

In her deposition, Kellie A. Deulley stated that she was with Mr. Tillman after her arrival on the scene but never took any vital signs;

The standard of care required that Dana J. Brown, Kellie A. Deulley and/or Matthew M. Knowlton transport Mr. Tillman to the nearest trauma center capable of stabilizing a patient with potential internal hemorrhage and a distended, rigid abdomen;

[NCEMS] Standards of Care states that a patient will be taken to the most appropriate facility;

* * *

Fisher-Titus Medical Center was a Level III trauma center with at least one trauma surgeon with a fellowship in trauma and critical care since

2012, however, any general surgeon assigned to Level III trauma call would have the skills and training necessary to stabilize Mr. Tillman;

Fisher-Titus Medical Center is approximately 11 miles from the accident intersection located near 13100 Ceylon Road;

Mr. Tillman was wearing a helmet at the time of the accident;

While a head injury is possible, it is more likely that his confusion was related to hemorrhagic shock;

Mr. Tillman should have been transported to Fisher-Titus Medical Center for stabilization of his internal injuries, which on autopsy included the following: laceration and rupture of the left hemidiaphragm; fractures of the left 4th – 6th ribs; partial transection of the inferior vena cava within abdominal cavity; numerous lacerations involving mesenteric blood vessels; multiple superficial liver lacerations; hemoperitoneum (3800 ml); and bilateral hemothoraces (Left: 900 ml, Right 100 ml);

Based upon reasonable medical probability, if Dana J. Brown, Matthew M. Knowlton, and Kellie a. Deulley had followed the standard of care on April 9, 2017, Mr. Tillman would have been transported to the most appropriate trauma center capable of handling his injuries, which in my opinion was Fisher-Titus Medical Center;

* * *

Based upon medical probability, it is my opinion that the standard of care was breached on April 9, 2017 by Dana J. Brown, Matthew M. Knowlton and Kellie A. Duelley, and that each breach was a cause of the death of Eric P. Tillman;

Based upon medical probability, it is my opinion that the emergency services administered to Eric P. Tillman by Dana J. Brown, Matthew M. Knowlton and Kellie A. Deulley were administered in a matter consistent with willful misconduct, and each was a cause of the death of Eric P. Tillman;

{¶ 35} As part of his expert opinion, Dr. Durgin concluded that the conduct of Brown and others constituted willful misconduct. This is a legal conclusion, however, and therefore not proper evidence of an immunity exception. *See, e.g., Blair v. Columbus Div. of Fire,* 10th Dist. Franklin No. 10AP-575, 2011-Ohio-3648, ¶ 33, citing *Donlin v. Rural Metro Ambulance, Inc.,* 11th Dist. Trumbull No. 2002-T-0148, 2004-Ohio-1704, ¶ 26 (additional citation omitted) (opinion did not create an issue of fact, but merely stated a position regarding culpability, a legal conclusion); *see also Mitchell,* 2005-Ohio-5261, ¶ 61 (legal conclusions in expert affidavit are properly disregarded).

{¶ 36} Aside from this conclusion, Dr. Durgin found Brown and other NCEMS personnel at the scene violated the applicable standard of care by failing to take vital signs more than once and opting to transfer Mr. Tillman to a Level I facility by Life

19.

Flight rather than the Level III facility nearby for stabilization. At best, Dr. Durgin's affidavit provides evidence of breach of the applicable standard of care by Brown and others in treating Mr. Tillman. The pertinent question, however, is whether the acts constituting breach can be construed for summary judgment purposes as demonstrating willful or wanton misconduct. *Mitchell* at ¶ 137. Negligent acts do not become willful or wanton acts "by virtue of sheer volume." *Id.* Additionally, willful and wanton acts do not differ from negligence by degree, but by definition. *Id.* at ¶ 138.

{¶ 37} A willful act involves a "set purpose, intention, deliberation," while negligence connotes thoughtlessness, inattention, and oversight. *Id.,* citing *Tighe,* 149 Ohio St.at 525, 80 N.E.2d 122; *Walker v. Mid-States Terminal, Inc.,* 17 Ohio App.3d 19, 23, 477 N.E.2d 1160 (6th Dist.1984). Furthermore, "'[n]egligence' and 'wanton' are 'mutually exclusive terms, implying radically different mental states[,]'" with wanton misconduct requiring a perversity and conscious disregard for likely injury. *Mitchell* at ¶ 139, citing *Tighe* at 525-526; *Donlin* at ¶ 19.

{¶ 38} We have previously addressed the concepts of "willful" and "wanton" in examining a paramedic's choices at the scene of a medical emergency, and determined that even a series of inept choices do not convert negligence into willful or wanton acts. In *Mitchell v. Norwalk Area Health Serv.,* 6th Dist. Huron No. H-05-002, 2005-Ohio-5261, a paramedic and EMT, responding to a call that developed into a cardiac emergency, chose to continue using a malfunctioning defibrillator rather than switch to

20.

the back-up unit brought to the scene by a second crew.  The patient subsequently died. *Mitchell* at ¶ 102-103.

{¶ 39} In addressing the question of willful misconduct, we noted that the first responders chose to continue using the malfunctioning defibrillator, and delayed using the back-up unit for 21 minutes after a second crew brought it to the scene.  The bulk of the wrongful death claim against the ambulance crew rested on their "failure to *immediately* use the Lifepack defibrillator that the second squad brought with them, and their continuing defibrillator attempts with the non-functioning Zoll unit[.]" *Mitchell* at ¶ 45.  We found that, while the choice to continue using the malfunctioning unit may have been intentional, an intentional choice may also "be made *unreflectively* or *thoughtlessly*; that is, the *intention* necessary to constitute willful misconduct implies a reflective mental state[.]"  (Emphasis sic.) *Mitchell* at ¶ 141.

{¶ 40} We rejected the argument that the conduct was willful, finding:

> [T]hese circumstances evidence an unskillful and ineffectual knee-
> jerk reaction under life and death circumstances.  While the consequences
> of harm in these circumstances is and always will be great, the squad
> members here continued to deliver care, even though some aspects of the
> care rendered here can readily be seen as 'thoughtless.'  Nonetheless,
> 'thoughtless' is the opposite of 'deliberation.'

21.

*Mitchell* at ¶ 141.  In *Mitchell,* the evidence demonstrated that choices made by the paramedic and EMT, even construed as deviations from the standard of care, did not demonstrate the reflective mental state required for willful misconduct, as any deviation by paramedics in responding to a serious medical emergency already carried a high probability of serious harm.  *Mitchell* at ¶ 143.

{¶ 41} In *Mitchell,* we also rejected argument in support of wanton misconduct, finding no "disposition to perversity" under circumstances in which the first responders were conscious that their acts "will in all probability result in injury."  *Mitchell* at ¶ 139, quoting *Donlin* at ¶ 19.  Unlike willful conduct, "intent need not be present for an act to be wanton, but the actor must be conscious that 'the probability that harm will result from such failure is great.'"  *Mitchell* at ¶ 139, citing *Donlin* at ¶ 17.

{¶ 42} In *Mitchell,* we found an absence of wanton misconduct, noting:

> Applying these legal standards to the facts, having construed those facts in a light most beneficial to appellants, we must conclude that the paramedics' acts could not have constituted wanton misconduct. Knowledge that a sudden cardiac arrest patient will, in all probability, suffer great harm from a failure to administer proper care will always exist for every trained paramedic and EMT; thus, this factor carries little weight in circumstances such as these. That is, while the harm may be of greater or lesser degrees in other professions, death is the only certain outcome for

22.

paramedics caring for a sudden cardiac arrest patient if proper care is not delivered; this situation demonstrates that even with proper care, the risk of serious injury or death is high; with negligent care, the risk is even greater. Even when all proper choices are made by a paramedic when delivering care in these circumstances, death is still a significant probability.

*Mitchell* at ¶ 140. As in *Mitchell,* the circumstances of this case included great risk, and even had Brown and others made all the proper choices, death was "a significant probability."

{¶ 43} In addition to the expert opinion of Dr. Durgin, appellants argue that Brown and others violated a standard of care as codified at R.C. 4765.40(A)(2) and (D), and Ohio Adm. Code 4765-14-05(A), and that Brown and his colleagues had no discretion to call for Life Flight based on medical necessity. Pursuant to R.C. 4765.40, the state board of emergency medical, fire, and transportation services must adopt written protocols for the triage of trauma victims. These protocols, and the exceptions also codified at Ohio Adm. Code 4765-14-05, provide the following:

The state triage protocols adopted under division (A) of this section shall require a trauma victim to be transported directly to an adult or pediatric trauma center that is qualified to provide appropriate adult or pediatric trauma care, unless one or more of the following exceptions applies:

23.

(a) It is medically necessary to transport the victim to another hospital for initial assessment and stabilization before transfer to an adult or pediatric trauma center;

(b) It is unsafe or medically inappropriate to transport the victim directly to an adult or pediatric trauma center due to adverse weather or ground conditions or excessive transport time;

(c) Transporting the victim to an adult or pediatric trauma center would cause a shortage of local emergency medical service resources;

(d) No appropriate adult or pediatric trauma center is able to receive and provide adult or pediatric trauma care to the trauma victim without undue delay;

(e) Before transport of a patient begins, the patient requests to be taken to a particular hospital that is not a trauma center or, if the patient is less than eighteen years of age or is not able to communicate, such a request is made by an adult member of the patient's family or a legal representative of the patient.

R.C. 4765.40(A)(2); *see also* Ohio Adm.Code 4765-14-05 (Exceptions to mandatory transport).

{¶ 44} The protocols require a determination of an appropriate facility based on several factors.  In other words, first responders must *make a choice* in order to comply

24.

with the triage protocols.  Appellants' challenge, accordingly, is not about a violation of the protocols, but rather, about the choice pursuant to those protocols in determining Eric Tillman needed helicopter transport to a Level I trauma center.  Furthermore, while appellants contend Brown and others had no discretion in this regard, or no choice, they provided no legal authority to support this position.

{¶ 45} Pursuant to R.C. 4765.40(D), "[n]o provider of emergency medical services * * * shall fail to comply with the state triage protocols[.]"  Contrary to appellants' argument, R.C. 4765.50 does not impose civil liability, but instead requires a paramedic or EMT to obtain proper certifications prior to performing the functions of a paramedic or EMT, and appellants asserted no claim based on a lack of certification.[5]  Therefore, R.C. 4765.49(A) and (B) is the applicable law, providing immunity to both Brown and NCEMS unless appellants demonstrate willful or wanton misconduct in treating Mr. Tillman.

---

[5] R.C. 4765.50(E) provides "On and after November 3, 2002, *no physician* shall purposefully do any of the following: (1) Admit an adult trauma patient to a hospital that is not an adult trauma center for the purpose of providing adult trauma care; (2) Admit a pediatric trauma patient to a hospital that is not a pediatric trauma center for the purpose of providing pediatric trauma care; (3) Fail to transfer an adult or pediatric trauma patient to an adult or pediatric trauma center in accordance with applicable federal law, state law, and adult or pediatric trauma protocols and patient transfer agreements adopted under section 3727.09 of the Revised Code." (Emphasis added.).  This case does not involve the conduct of a physician, and appellants do not explain the applicability of this statute to the facts of this case.

25.

{¶ 46} Appellants also compare the facts of this case to those in *Herron v. City of Columbus,* 2016-Ohio-503, 56 N.E.3d 347 (10th Dist.), arguing issues of fact as to whether the care provided by Brown and others was significant enough to constitute "any care," relevant to a determination of wanton misconduct. In *Herron,* however, the parties disagreed regarding the underlying facts, relative to the care provided. Specifically, the evidence included contradictory testimony as to whether the paramedics who responded to the call for respiratory distress even provided care. One witness testified that "when the paramedics initially arrived, they simply stood around and asked [the patient] what had happened without providing any care to [her]." *Herron* at ¶ 18. In finding material issues of fact, precluding summary judgment, the Tenth District Court of Appeals found the evidence demonstrated the paramedics "had a lax attitude," proceeded "with no sense of urgency and spent little time interacting with [the patient] to determine her medical needs." *Id.* at ¶ 20. Furthermore, the court found this unresponsive conduct "led to their failure to treat [the patient's] respiratory distress, which in turn led to cardiorespiratory arrest and [the patient's] eventual death[.]" *Id.*

{¶ 47} The facts in Eric Tillman's case are different, as demonstrated by the record evidence. Aside from the expert's legal conclusion that the paramedics' conduct was willful, the evidence demonstrated Brown and others gave Tillman prompt attention and provided immediate care, and believed Tillman needed a Level I trauma center based on the circumstances gleaned from their assessment of the mechanism of injury and

26.

Tillman's apparent condition.  The remainder of the expert affidavit opines that the paramedics' choices did not meet the applicable standard of care.  However, even if we presume the choices made by Brown and his colleagues were incorrect and fell below the standard of care, this presumption still does not demonstrate willful or wanton misconduct.

{¶ 48} The record contains no evidence of an intent to purposefully do a wrongful act or of a failure to exercise any care under circumstances in which great harm will result from that failure.  Instead, the evidence shows Brown and others sought to get Mr. Tillman to the care he needed, in already dire circumstances.  As we found in *Mitchell,* inferences drawn in appellants' favor may demonstrate potential breaches of the standard of care, but "the *act of breaching* the standard of care does not rise to the level of willful or wanton misconduct" without something more. (Emphasis sic.) *Mitchell* at ¶ 143.

{¶ 49} Our application of the law is consistent with the application in other jurisdictions, considering equally tragic outcomes.  In *Blair v. Columbus Div. of Fire,* 10th Dist. Franklin No. 10AP-575, 2011-Ohio-3648, the Tenth District Court of Appeals found paramedics were entitled to immunity where they had a paramedic student intubate the patient, as permitted for a trainee, without the successful use of capnography to ensure the tube's proper placement.  The tube was not properly inserted, and the patient died before the emergency room physician could correct the error with proper intubation. *Blair* at ¶ 13.  In finding no willful or wanton misconduct, the Tenth District noted

27.

neither a deliberate intent to ignore standard procedures nor an indifference to potential consequences to their patient. *Id.* at ¶ 39. "Instead, the paramedics were concerned for [their patient's] health and administered care accordingly." *Id.*

{¶ 50} Similarly, in *Denham v. New Carlisle,* 138 Ohio App.3d 439, 741 N.E.2d 587 (2d Dist.2000), the Second District Court of Appeals found no willful or wanton misconduct by paramedics who responded to a call to treat a bar patron who sustained an injury in a fall. The paramedics left without transporting the patient, who exhibited signs of extreme intoxication but was otherwise conscious and refusing care. The paramedics did not take a patient history or obtain vitals before leaving the bar, and after the patient's wife took him home, he collapsed and later died from blunt force head injuries. *Denham* at 441. In finding no exception to immunity, the Second District noted that "[a]lthough the paramedics were arguably negligent, the evidence in this record does not demonstrate more than negligence on their part." *Id.* at 448.

{¶ 51} In *Brannan v. Scioto Cty.,* 2014-Ohio-4453, 20 N.E.3d 1098 (4th Dist.), the Fourth District Court of Appeals determined paramedics, who delayed transporting a newborn who was in distress and later died, were entitled to immunity. In that case, paramedics responded to a 911 call for a 14-year old in labor. The infant was born shortly before paramedics arrived, and paramedics worked to keep the infant warm and breathing, administering oxygen using the blow-by method. *Brannan* at ¶ 13-14. Despite their efforts, the infant started turning blue. *Id.* at ¶ 15. However, the paramedics

28.

delayed transporting the infant until a back-up ambulance arrived, determining it would be improper to abandon the mother of the baby, who was also a patient. *Id.* at ¶ 16. In rejecting argument of willful or wanton misconduct, the Fourth District found that, under the circumstances, the paramedics responded to a one-patient call but were met by two patients. They immediately called for back-up, and provided treatment at the scene until back-up arrived. *Id.* at ¶ 49-50. The choices made by the paramedics at the scene, therefore, did not demonstrate an intentional deviation from a clear duty or a deliberate purpose to disregard a duty, and did not demonstrate a failure to exercise care or an indifference to a known risk of harm. *Id.*

{¶ 52} Based on the applicable law to similar facts, we agree with the conclusion that disagreement over the choices made in treatment are not sufficient evidence to establish material issues of fact regarding immunity exceptions. Appellants must demonstrate something more than evidence of negligence to demonstrate willful or wanton misconduct by Brown. Appellants must also demonstrate something more that negligence to demonstrate willful or wanton misconduct of NCEMS employees, in order to impute that misconduct to NCEMS. Because the record, construed in appellants' favor, demonstrates negligence, at best, appellants failed to demonstrate an exception to immunity based on willful or wanton misconduct. Accordingly, Brown and NCEMS are entitled to immunity under R.C. 4765.49(A) and (B), and the trial court properly granted summary judgment. We find appellants' sole assignment of error not well-taken.

29.

## IV. Conclusion

{¶ 53} Based on the foregoing, we affirm the judgment of the Erie County Court of Common Pleas, granting summary judgment in favor of appellees. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Thomas J. Osowik, J.

_____
JUDGE

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.